993 F.2d 722
 38 Fed. R. Evid. Serv. 835
 TK-7 CORPORATION, Tal Technologies, and Moshe Tal,
Plaintiffs-Appellants and Appellees,
v.
The ESTATE OF Ihsan BARBOUTI, Deceased, and Haidar Barbouti,
Defendants-Appellees, and Appellants,
and
IBI, INC., Counter Plaintiff-Appellee,
v.
TK-7 CORPORATION, Tal Technologies, and Moshe Tal, Counter Defendant.
 Nos. 91-6317, 91-6384.
 United States Court of Appeals,
Tenth Circuit.
 May 7, 1993.
 
 1
 John Michael Johnston (Jay D. Adkisson, with him on the brief), Claro & Johnston, Oklahoma City, OK, for plaintiffs-appellants, appellees TK-7 Corp., et al.
 
 
 2
 Arthur R. Angel (James A. Ikard, with him on the brief), Angel & Ikard, Oklahoma City, OK, for defendants-appellees, appellants The Estate of Ihsan Barbouti, et al.
 
 
 3
 Before LOGAN and SEYMOUR, Circuit Judges, and BROWN*, District Judge.
 
 
 4
 WESLEY E. BROWN, Senior District Judge.
 
 
 5
 The plaintiffs below brought this action for civil conspiracy. They alleged that the defendants conspired to take over the TK-7 Corporation, an Oklahoma-based company that developed petroleum fuel additives, for the purpose of illegally transporting shipments of chemicals to Libya. After hearing the plaintiffs' evidence, the district court directed a verdict in favor of the defendants. The court found that the elements of a conspiracy had not been shown by clear and convincing evidence and also found that there was insufficient evidence that plaintiffs had sustained damages as a result of the alleged conspiracy. Plaintiffs now appeal, contending that the evidence was sufficient to warrant the submission of the case to the jury. Having reviewed the record in its entirety,[1] we agree that the plaintiffs' evidence fails to show with reasonable certainty that they sustained the lost profit damages which they claimed. Accordingly, we affirm on that basis.
 
 
 6
 I. Standard of Review.
 
 
 7
 A grant of a directed verdict in a diversity action is subject to review de novo on appeal under the same standard that the trial court applied. Guilfoyle ex rel. Wild v. Missouri, Kan. & Tex. R.R., 812 F.2d 1290, 1292 (10th Cir.1987). Under that standard, a court may grant a directed verdict "only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position." O.E.R., Inc. v. Hickerson, 880 F.2d 1178, 1180 (10th Cir.1989). In determining whether a directed verdict was appropriate, we must construe the evidence and all inferences therefrom in the light most favorable to the non-moving party. Hickerson, supra. Keeping that standard in mind, the evidence in the light most favorable to the plaintiffs reveals the following:
 
 
 8
 II. Summary of Evidence of the Alleged Conspiracy.
 
 
 9
 Dr. Ihsan Barbouti was an Iraqi expatriate residing in London, England, in 1987. He held ownership interests in many corporations, several of which, including Ihsan Barbouti International ("IBI, Inc."), are named as defendants in this case. Dr. Barbouti's son, Haidar, is also named as a defendant. Dr. Barbouti died on July 2, 1990, and his estate was substituted as a defendant.
 
 
 10
 In the spring of 1987, Dr. Barbouti became interested in purchasing a company he had heard about, the TK-7 Corporation. TK-7 was a Nevada corporation doing business in Oklahoma City, Oklahoma. The company had been engaged in the development, manufacture, distribution and marketing of fuel additives since 1983. Plaintiff Moshe Tal was the president of TK-7. Through a third person, Dr. Barbouti arranged a meeting with Mr. Tal in April, 1987, in Oklahoma City.
 
 
 11
 In July of 1987, after several meetings between Dr. Barbouti and Mr. Tal, an agreement between IBI, Inc., Moshe Tal, and TK-7 was signed. The agreement set forth terms under which IBI was to purchase an interest in TK-7.[2] Mr. Tal was asked to come to Zurich, Switzerland, in September of 1987, in order to meet with Dr. Barbouti and a representative of IBI Engineering, one of Dr. Barbouti's corporations. During this meeting, Dr. Barbouti discussed the possibility of marketing TK-7 fuel additives internationally. He also proposed setting up a corporation to engage in international chemical trading. Dr. Barbouti stated that the chemical trading could be coordinated by IBI Engineering in Frankfurt, Germany. Dr. Barbouti asked Mr. Tal to obtain a vessel load of certain chemicals in the United States and to prepare them for shipment to Europe. Some of the chemicals requested by Dr. Barbouti were those used in the TK-7 formula; others were unfamiliar to Mr. Tal.
 
 
 12
 It was during this trip that Mr. Tal first became concerned about Dr. Barbouti's connections with Libya. Dr. Barbouti told Mr. Tal that he was late in arriving in Zurich because he had been delayed in Libya. After their meeting in Zurich, the two men flew to London. During the flight, Mr. Tal questioned Dr. Barbouti about his work in Libya. Dr. Barbouti, who was an architect, said that he was working on a large project in Libya under a contract with the Libyan Ministry of Atomic Energy. After Mr. Tal returned to Oklahoma City, he decided to investigate Dr. Barbouti's involvement with Libya. (At trial, the plaintiffs introduced a copy of an agency contract, which they obtained in discovery, between Dr. Barbouti and the Libyan Secretary of Atomic Energy.)
 
 
 13
 Sometime after the above-described meeting, Dr. Barbouti contacted Mr. Tal and asked whether he had obtained the shipment of chemicals they had talked about. Mr. Tal said that he was concerned about the possibility of an accident in shipping the chemicals and was checking into it. Dr. Barbouti became upset and told him that he didn't need to check into the matter. Dr. Barbouti gave Mr. Tal the name of Joseph Gedopt, a man with a company called Crosslink, whom Dr. Barbouti identified as an expert in the shipping of hazardous chemicals.
 
 
 14
 During October of 1987, Mr. Tal wrote several letters to IBI in which he requested that IBI make payment on certain obligations which Mr. Tal contended were covered by the parties' July agreement. In November of 1987, Mr. Tal and Dr. Barbouti had what proved to be a final meeting in New York City. During that meeting, Mr. Tal asked Dr. Barbouti if the government of Libya had any financial interest in the TK-7 projects. Dr. Barbouti told Mr. Tal that it did but that it was "none of your business." The amounts that IBI was to pay under the July, 1987 agreement were also discussed. At this point in time, IBI had forwarded approximately $700,000 to Mr. Tal to pay various obligations of TK-7. Mr. Tal contended that IBI was further obligated to pay other liabilities of TK-7 totaling approximately $1.1 million, including amounts for back salary owed to him. Dr. Barbouti refused to pay the amounts requested, contending they were personal items for which IBI was not responsible under the agreement. The meeting broke up when the two were unable to agree on these matters. Subsequent to this meeting, Dr. Barbouti refused to have any personal communication with Mr. Tal. Mr. Tal continued to have discussions with Haidar Barbouti and other IBI agents.
 
 
 15
 In their case in chief, the plaintiffs presented the testimony of two associates of Dr. Barbouti. The first of these, Mike Peress, was a senior vice president of Metropolitan Life Insurance Company in New York City and had been involved in several real estate investments with Dr. Barbouti. He was also associated with a New York company called RCR, in which Dr. Barbouti held an interest, and was involved in the proposed acquisition of TK-7. Peress testified that he heard Dr. Barbouti admit to being the architect and procurer of material for a plant in Libya that Dr. Barbouti classified as a pharmaceutical plant. Peress also stated that Dr. Barbouti mentioned that he could get Joseph Gedopt (the man whose name Dr. Barbouti referred to Moshe Tal in the event Tal had questions about shipping chemicals) to redirect, camouflage, or change manifests on any shipment Dr. Barbouti saw fit. The second associate of Dr. Barbouti's who testified was Bruce Munden, a pipeline consultant from Dallas, Texas, who worked on various projects for IBI companies. Munden testified that in the summer of 1988 Dr. Barbouti mentioned that he had a pharmaceutical plant in the Middle East that was developing a blood-pressure medication. Munden testified that in January of 1989 he heard information linking Dr. Barbouti to a pharmaceutical plant in Rabta, Libya; and that U.S. intelligence agents believed the plant to be a chemical weapons plant. Munden flew to London to question Dr. Barbouti about the matter. According to Munden, Dr. Barbouti stated that he had designed the plant at Rabta for Colonel Ghadafi. Barbouti further said that no one could prove that he had anything to do with chemical weapons but added that, if the U.S., the Soviet Union and Israel could have chemical weapons, there was no reason why Colonel Ghadafi could not have them either. Munden also testified that, in the course of conversations occurring after publicity had surfaced about the Rabta plant, he and other executives of IBI companies were told by Haidar Barbouti to search their files and to purge them of any documents relating to Libya.
 
 
 16
 The plaintiffs produced the testimony of an expert on chemicals, who testified that the list of chemicals that Dr. Barbouti asked Moshe Tal to obtain contained precursors for nerve gases and explosives. Plaintiffs also introduced a 1989 report to Congress by William Webster, the Director of the Central Intelligence Agency. In the report, Webster described a building complex near Rabta, Libya, as consisting of "a chemical agent production plant and a metal fabrication facility" which, when operational, would give Libya the largest chemical warfare agent production plant in the third world. Webster noted that the Libyans claimed the facility was intended to produce pharmaceuticals, but Webster concluded that the primary purpose of the site was "clearly chemical warfare production."
 
 
 17
 The plaintiffs contended that this and the other evidence presented at trial showed that Dr. Barbouti and others had engaged in a conspiracy to acquire TK-7 Corporation for the purpose of transporting chemicals to Libya. Plaintiffs maintained that such shipments would have violated Executive Orders prohibiting the export of goods or technology to Libya.[3]
 
 
 18
 III. Damages.
 
 
 19
 The plaintiffs claimed that the alleged conspiracy caused them damages in the form of lost profits. They argued that, but for the conspiracy, TK-7 would have enjoyed profits from two proposed joint business ventures it was in the process of negotiating with interested parties in Venezuela and Great Britain. The proposed ventures never materialized; according to the plaintiffs this was due to Dr. Barbouti's plan to use TK-7 to export chemicals to Libya. Plaintiffs contend that the joint ventures would have generated profits in excess of $7 million. In order to determine whether plaintiffs presented sufficient evidence of damages to require the submission of their claims to a jury, we first turn to the substantive law of Oklahoma.
 
 
 20
 IV. Oklahoma Law Pertaining to Damages for Loss of Future Profits.
 
 
 21
 An essential element of a claim of civil conspiracy is a showing that the plaintiff suffered actual damages as a result of the conspiracy. See Barsh v. Mullins, 338 P.2d 845, 847 (Okla.1959) ("The gist of a civil action for conspiracy is damages and not the conspiracy.") The sole damages claimed by the plaintiffs in this case are lost future profits. Under Oklahoma law, any person who suffers detriment from the unlawful act of another may recover from the person at fault compensation in the form of money damages. 23 O.S. § 3. The general measure of damages for the breach of an obligation not arising from contract is the amount which will compensate for all detriment proximately caused thereby. 23 O.S. § 61. The compensation that may be awarded is not necessarily limited to that detriment which has occurred as of the time a cause of action is commenced; damages may be awarded for detriment certain to result in the future. 23 O.S. § 5. In other words, a person may recover for future loss caused by a wrongful act provided the damages are reasonably certain to occur.
 
 
 22
 The courts in Oklahoma have examined claims for lost future profits on numerous occasions. In analyzing such claims, Oklahoma courts have typically drawn a distinction between claims of lost profits of established businesses versus lost profits of unestablished businesses. The loss of profits proximately resulting from the destruction of an established business has long been held to constitute a recoverable element of damages. Firestone Tire & Rubber Co. v. Sheets, 178 Okl. 191, 62 P.2d 91, 93 (1936). On the other hand, when the business at issue is unestablished, the uncertainty associated with such an enterprise has generally precluded as a matter of law the recovery of any damages for lost future profits. See Wellington v. Spencer, 37 Okl. 461, 132 P. 675, 677 (1913) ("Where the plaintiff has just made his arrangements to begin business, and he is prevented from beginning either by tort or a breach of contract, or where the injury is to a particular subject-matter, profits of which are uncertain, evidence as to expected profits must be excluded from the jury because of the uncertainty."); Carpenters' Local 1686 v. Wallis, 205 Okl. 285, 237 P.2d 905, 908 (1951) (As a general rule, anticipated profits of a business are too remote and speculative to warrant a judgment for their loss; the exception to this rule is that lost profits from an established business may be recovered.). See also Dieffenbach v. McIntyre, 208 Okl. 163, 254 P.2d 346, 349 (1952) (Plaintiff's business had only been at its present location for two months; that was not sufficient time to demonstrate that the business was established or that the profits therefrom were reasonably ascertainable.) Cf. Ft. Smith & Western R. Co. v. Williams, 30 Okl. 726, 121 P. 275, 277 (1912).
 
 
 23
 The bar as a matter of law against claims for lost profits by unestablished businesses is sometimes called the "new business rule." See 22 Am.Jur.2d Damages § 627. As the district court below noted in ruling on the defendants' motion for summary judgment, many states have abandoned the strict new business rule. See id. See also Bollas, The New Business Rule and the Denial of Lost Profits, 48 Ohio St.L.J. 855 (1987). In doing so, courts have recognized that a strict application of the rule could encourage tortious behavior or the breaking of contracts by those dealing with new businesses. Instead of a strict bar on such claims, many courts now hold that, regardless of whether a business is new or is established, lost profits can be recovered if it is possible to show by competent evidence and with reasonable certainty that profits would have been made and the amount of those profits. 22 Am.Jur.2d Damages § 627.
 
 
 24
 Based on comments in two recent Oklahoma cases, the district court found that Oklahoma would no longer apply the strict new business rule. Relying on Ferrell Construction Co. v. Russell Creek Coal Co., 645 P.2d 1005 (Okla.1982) and Cook v. Oklahoma Bd. of Public Affairs, 736 P.2d 140 (Okla.1987). In this appeal, the parties disagree as to whether Oklahoma courts would follow the trend with regard to claims on behalf of new businesses or whether Oklahoma would continue to strictly apply the new business rule. We find it unnecessary to resolve that question, however, because we find that even if the more lenient standard is applied to the evidence in this case, the plaintiffs have failed to show with reasonable certainty that they would have enjoyed profits from their two proposed joint ventures.
 
 
 25
 A. The Chacin Claim.
 
 
 26
 1. Summary of the Evidence.
 
 
 27
 One of the proposed joint ventures TK-7 was negotiating was with two brothers, Gustavo and German Chacin (hereinafter "the Chacins"), of Venezuela. In June of 1987, TK-7 and the Chacins signed a "Letter of Intent" declaring that they had agreed to enter into a joint venture agreement to manufacture and market TK-7 fuel additive products in Venezuela. The letter set forth some of the details of how the joint venture agreement would be structured. Moshe Tal testified that in September of 1987 he felt obligated to tell the Chacins that he believed there was a connection between Dr. Barbouti's contacts in Libya and his attempted purchase of TK-7. Tal testified that the Chacins responded by saying that they would not go forward with the joint venture until TK-7 had totally disengaged itself from the Barboutis and until IBI did not claim any stock in the company. The Chacins were not called as witnesses at the trial. The plaintiffs presented evidence indicating that the Chacins and Moshe Tal had an agreement to go forward with the joint venture as soon as the instant suit with the Barboutis was resolved. Plaintiffs contend that the defendants have caused a four-year delay in getting the Venezuelan joint venture underway and contend that they are entitled to recover lost profits that TK-7 would have made in the venture. Mr. Tal testified that had the venture gone forward when planned, TK-7 would have made profits from the sale of fuel additive concentrate to the joint venture as well as from royalties on the joint venture's sale of additives. He also stated, without elaboration, that his projection or estimate of the amount of sales lost due to the Barbouti's attempted purchase of TK-7 was four or five million dollars.
 
 
 28
 The plaintiffs also presented testimony from Dr. Jerry D. Boswell, a financial economist and professor of finance at Metropolitan State College in Denver, Colorado. Dr. Boswell was called by the plaintiffs as an expert to calculate the amount of damages sustained by TK-7. In addition to his other testimony, the plaintiffs intended to have Dr. Boswell state an opinion as to the amount of damages sustained by TK-7 from the loss of the Venezuelan joint venture. At trial, however, the district court ruled that there was a lack of foundation for Dr. Boswell's opinion on the Chacin claim. The court also ruled that this testimony would not assist the trier of fact in determining the issues and that the information on which Dr. Boswell based his opinion was not of a type that experts in this field would reasonably rely upon in forming such opinions. See Fed.R.Evid. 702, 703. Although appellants' reply brief suggests that the district court's exclusion of this evidence constitutes grounds for reversing the judgment, this suggestion is unaccompanied by any discussion of the court's specific rulings. Moreover, the record submitted on appeal contains only fragmented portions of the transcript of the discussion relating to the court's ruling. Under the circumstances, we are unable to say that the district court abused its discretion in excluding Dr. Boswell's opinion as to Venezuelan damages.
 
 
 29
 The plaintiffs introduced a memorandum written in 1987 by a TK-7 sales representative, J.W. Speaks. The memorandum, referred to as the "Exline Report," was introduced over the hearsay objections of the defendants through a former bookkeeper of the TK-7 Corporation. Speaks was not called as a witness at the trial. The memorandum contains "revenue projections" for TK-7 products in various countries, including Venezuela, Mexico, Peru, Brazil, the Philippines and the Far East. None of the projected sales ever took place. The memorandum predicted monthly revenues of $136,600 per month in Venezuela for TK-7 from sales of fuel additives to a gasoline producer called Lagovin, S.A. The sales figures were apparently based on an assumption that TK-7 would be selected as a fuel additive for use in gasoline produced by Lagovin.
 
 
 30
 2. Appellants' Contentions as to the Chacin Claim.
 
 
 31
 Plaintiffs contend the evidence shows that they lost four to five million dollars in profits from delay in getting the TK-7 joint venture with the Chacins in Venezuela underway. Plaintiffs cite two particular items of evidence in support of such a finding: Moshe Tal's opinion and the "Exline Report." We find that neither of these items is sufficient to show with reasonable certainty that TK-7 was damaged from the delay in the Chacin venture allegedly caused by the defendants.
 
 
 32
 At the close of Moshe Tal's direct testimony, the following questions and answers were given:
 
 
 33
 Q. Mr. Tal, are you certain that the Barboutis have cost you four years in delay of lost profit sales through TK-7 de Venezuela [the joint venture] in South America?
 
 
 34
 A. Yes, sir.
 
 
 35
 Q. What is your projection or estimate of the amount of those lost sales?
 
 
 36
 A. Approximately $4 or $5 million.
 
 
 37
 Aplt.App.Vol. II at 240. Although there was no objection to this testimony, it is clear that Mr. Tal's opinion was without an adequate foundation and was not competent evidence of damages. The plaintiffs failed to present any evidence showing that Mr. Tal had expertise or personal knowledge that would allow him to express an opinion as to future sales and profits to be derived from the Chacin joint venture with any reasonable degree of accuracy. See Fed.R.Evid. 702. Clearly, a projection of future sales for a product such as TK-7's in a foreign market requires at a minimum that the individual making the projection have some familiarity with the structure of the market for which he is making a forecast. There is nothing in the record to indicate that Mr. Tal had any knowledge of the particular variables that would affect sales or profitability of TK-7 in the Venezuelan market. Cf. State Office Systems v. Olivetti Corp. of America, 762 F.2d 843, 846 (10th Cir.1985). For example, nothing in Mr. Tal's testimony indicated that he had any knowledge at all of the laws or governmental regulations pertaining to fuel additives in Venezuela. Nor was it shown that he had any knowledge of the fuel distribution system in that country. There was no indication that Mr. Tal had any familiarity with any competition TK-7 might have encountered in Venezuela. Indeed, the record indicates that plaintiffs did not even contend in the district court that Mr. Tal had formulated an independent opinion as to the amount of lost profits from the Venezuelan joint venture. Rather, Mr. Tal's "opinion" that TK-7 lost four or five million dollars was based on the conclusions of an individual named Humberto Penaloza, who had allegedly performed a study to determine the marketability of TK-7 products in Venezuela. See Aple.App.Vol. 4 at 652-53. See also Aplt. Reply Br. at 9. No such study was introduced into evidence. Mr. Tal testified that Penaloza (who did not testify at the trial) told him that TK-7 could capture forty-five per cent of the potential market for fuel additives in Venezuela. Although the basis for this projection is not clear from the record, it was apparently based in part on Penaloza's belief that TK-7 would be chosen by a large South American fuel producer as a fuel additive for its gasoline. See Aplt.App.Vol. 2 at 374. The record does not indicate that Mr. Tal had any personal knowledge of these matters other than what he was told by Mr. Penaloza and others. Clearly, Mr. Tal's testimony regarding TK-7's potential sales in Venezuela constituted hearsay insofar as it was an attempt to prove the truth of Mr. Penaloza's out-of-court statements regarding TK-7's potential sales in Venezuela. See Fed.R.Evid. 801(c) (Hearsay is a statement, other than one made by the declarant while testifying at the trial, offered in evidence to prove the truth of the matter asserted.) Insofar as Mr. Tal was making a projection based on his own personal knowledge, that opinion was without a foundation and amounted to nothing more than speculation.
 
 
 38
 In their brief, appellants raise the issue of whether Mr. Tal's experience in the fuel additive business gave him sufficient expertise to express an opinion on projected sales. In particular, appellants argue that the evidence showed that Mr. Tal had experience in marketing TK-7 in a foreign country and was therefore qualified to express an opinion with regard to sales in Venezuela. The evidence to which appellants refer consisted of the following testimony by Mr. Tal:
 
 
 39
 Q. Have you had occasion in another foreign country to market and sell TK-7?
 
 
 40
 A. Yes, sir.
 
 
 41
 Q. Tell the court and jury what other country that is.
 
 
 42
 A. In Israel.
 
 
 43
 Aplt.App.Vol. II at 228. This is more or less the extent of the discussion in the record with regard to Mr. Tal's experience in marketing TK-7 in Israel. This testimony is clearly insufficient to qualify Mr. Tal as an expert to express an opinion predicting sales in Venezuela. No specific evidence of Mr. Tal's experience in Israel was presented. Moreover, there was no evidence from which one could reasonably conclude that the Israeli and Venezuelan market for fuel additives was similar enough that Mr. Tal's experience selling TK-7 in Israel would allow him to make a projection of sales in Venezuela.
 
 
 44
 Appellants correctly point out that the defendants failed to object to Mr. Tal's testimony as to his opinion on the amount of profits lost in Venezuela. This does not mean, however, that the district court was precluded from considering whether Mr. Tal was qualified to express an opinion on the matter. By granting the defendants' motion for a directed verdict, the district court unquestionably found that Mr. Tal's opinion was not competent evidence of damages. This is consistent with the district court's independent duty to determine the qualifications of a witness to testify. See Renaud v. Martin Marietta Corp., 972 F.2d 304, 308 (10th Cir.1992). Moreover, it is clear that the court concluded that Mr. Tal was not properly qualified as an expert. The court sustained the defendant's prior objection that Mr. Tal was not competent to state his opinion as to the amount of profits TK-7 would have generated from the Werber joint venture (the other joint venture for which the plaintiffs claimed lost profits). Aple.App.Vol. 3 at 588. In sum, Mr. Tal's testimony was insufficient to show with reasonable certainty that the plaintiffs suffered any lost profit damages from the loss of the Venezuelan joint venture.
 
 
 45
 Appellants next contend that the "Exline Report" established that plaintiffs suffered damages in the form of lost profits from the proposed Venezuelan joint venture. The Exline Report was a memorandum written in 1987 by TK-7 sales representative J.W. Speaks. In the report, Speaks set forth TK-7 product and revenue projections for Venezuela and other countries. Although the district court apparently admitted the document over the hearsay objections of the defendants, we think it clear that the document was not admissible to show the amount of profits lost by TK-7 in Venezuela.
 
 
 46
 The plaintiffs argue that the Exline Report fell within the business records exception to the hearsay rule. See Fed.R.Evid. 803(6). We conclude that the document contains hearsay and cannot serve as evidence that the plaintiff lost profits from the alleged delay to the Venezuelan joint venture. To begin with, the plaintiffs failed to lay a proper foundation for the admission of the document under Rule 803(6). The custodian of records for TK-7 Corporation indicated that J.W. Speaks went to Venezuela while a market study was being done and that Speaks prepared the Exline Report because he was under a duty to report to TK-7 on matters he learned in Venezuela. This testimony by itself does not demonstrate that the memorandum was "kept in the course of a regularly conducted business activity" or that it was "the regular practice of that business activity to make the memorandum." Fed.R.Evid. 803(6). See United States v. Markopoulos, 848 F.2d 1036, 1039 (10th Cir.1988). Even if the plaintiffs had established an adequate foundation under Rule 803(6), however, the document would not be admissible because it contains double hearsay. The information set forth in the report pertaining to TK-7's potential sales was clearly based on the opinions of individuals other than Speaks.[4] These opinions were apparently conveyed to Speaks and recorded by him in the Exline Report. There was no foundation to show that these other individuals who supplied the information to Speaks were acting in the course of a regularly conducted business activity of TK-7. As such, the exception for business records does not shield their out-of-court assertions from the rule against hearsay. See United States v. Snyder, 787 F.2d 1429, 1434 (10th Cir.1986) (When any of the participants are outside the pattern of regularity of activity, the reason underlying the business records exception fails.) See also Wilson v. Zapata Off-Shore Co., 939 F.2d 260, 271 (5th Cir.1991).[5] This hearsay information is the only evidence in the record before us pertaining to the likelihood of TK-7 establishing any particular level of sales of its product in Venezuela. Accordingly, any suggestion that the Exline Report demonstrates lost profit damages with any reasonable certainty is untenable. Fed.R.Evid. 802. In sum, no evidence was presented to show with any reasonable certainty either the fact or the amount of lost profit damages suffered by the plaintiffs from the alleged loss of the Venezuelan joint venture.
 
 
 47
 B. The Werber Claim.
 
 
 48
 1. Summary of the Evidence.
 
 
 49
 The second joint venture underlying the plaintiffs' claims of lost profits was a proposal to sell TK-7 products in Britain. Some of the testimony at trial indicated that Dr. Barbouti, as part of a plan to acquire TK-7 Corporation, intended to get Moshe Tal dependent on him for operational funding and then "pull the carpet out from under" him. Plaintiffs contend that in furtherance of this plan Dr. Barbouti threatened to stop forwarding payments under the IBI buy-out agreement unless Mr. Tal canceled a marketing arrangement he had with a British distributor named D.A. Werber. Moshe Tal testified that he canceled the arrangement at the behest of Dr. Barbouti. The record does not disclose the precise nature of Tal's arrangement with Werber, although Mr. Tal testified that Werber intended to purchase or build a "filling facility" in Great Britain, apparently for the purpose of blending TK-7 products with gasoline. Mr. Tal indicated that TK-7 and Werber intended to form a joint venture to distribute TK-7 products and testified that TK-7 would have made profits from the sale of products to the joint venture company as well as from that company's sales to customers in Great Britain. Mr. Tal further testified that the "profit ratio" a distributor of TK-7 products could expect to receive varied from 45 to 55 per cent.
 
 
 50
 Moshe Tal testified that Mr. Werber had "experts" conduct a market study in Great Britain for TK-7 products. This "Werber market study" was introduced into evidence. The study discussed several factors to be considered in any proposed joint venture to market TK-7 products in Great Britain. The study appeared to project sales in Great Britain based on an assumption that TK-7 would capture five per cent of something called the British "road hauler industry." Neither Mr. Werber nor any other individual involved in the preparation of the market study was called to testify.
 
 
 51
 The plaintiffs' financial expert, Dr. Jerry Boswell, testified about the Werber market study. Boswell testified that prior to the trial he spoke with D.A. Werber about the study. According to Boswell, the study was prepared by Werber, who had an MBA degree, together with help from two other individuals, a British economics professor and a British consultant with an MBA. Boswell testified that he was satisfied as to the credentials of the individuals preparing the study. He also gave the following testimony:
 
 
 52
 Q. In connection with your review, did you find that the marketing studies as done by D.A. Werber and his staff were sufficient for you to do forecasting of damages?
 
 
 53
 A. Based upon my review of those and my analysis and professional judgment, those were adequate as marketing studies for this purpose.
 
 
 54
 Aplt.App.Vol. 2 at 657. Boswell also stated that he thought the study "would be very valid, very reliable in the sense that they were done for business purposes for people who were considering making an investment." Id. at 281-82. Dr. Boswell stated his opinion that the plaintiffs suffered lost profits of at least $2,315,028 from the loss of the Werber marketing arrangement.
 
 
 55
 2. Appellants' Contentions as to the Werber Claim.
 
 
 56
 Appellants argue that the district court erred in granting a directed verdict because there was sufficient evidence of damages from the loss of the British joint venture to require the submission of the case to the jury. We disagree. The cornerstone of the plaintiffs' claim that they suffered lost profit damages was an assertion that TK-7 would have enjoyed substantial profits from sales of fuel additives in Great Britain had the joint venture gone forward. Plaintiffs failed to present any admissible evidence, however, to show that TK-7 was likely to achieve any particular level of success in the British market. No admissible evidence whatsoever was presented concerning the variables that could affect sales of TK-7 in Britain. No witness with any personal knowledge of the potential for sales of fuel additives in Britain testified at the trial.
 
 
 57
 On the record before us, there are only two possible sources of evidence from which an inference regarding TK-7's sales prospects in Britain could even arguably come. The first of these was the market survey report of D.A. Werber. The Werber report contains a discussion of factors that could affect sales of TK-7 in Britain and appears to contain Mr. Werber's projection that TK-7 would be able to capture five per cent of a certain segment of the market for fuel additives in Britain.[6] The plaintiffs did not call Mr. Werber to testify at trial, however, and any attempt to use his written report to establish TK-7's projected sales is barred by the rules against hearsay. Fed.R.Evid. 801, 802.
 
 
 58
 The other possible source of evidence concerning the likely sales of TK-7 in Britain was the opinion of Dr. Boswell, the plaintiffs' financial expert. Appellants make two incompatible arguments in their attempts to show that Dr. Boswell's testimony was sufficient to show damages. First, they suggest that Dr. Boswell's use of the Werber figures was proper because an expert may express an opinion based upon conclusions reached by other experts. Toward this end, they discount those portions of the record showing that Dr. Boswell did not make an independent projection of the sales that TK-7 was likely to achieve through the joint venture in Great Britain and that he did not have the expertise to make such a projection. Aplt.Reply Br. at 7-8. Rather, appellants argue, his task was to calculate the amount of TK-7's lost profits by assuming the sales projections of D.A. Werber. Id. Cf. Aplt.App.Vol. 2 at 284. In support of this argument, appellants point to Int'l. Adhesive Coating Co. v. Bolton Emerson Int'l., Inc., 851 F.2d 540 (1st Cir.1988), and argue that it demonstrates that Dr. Boswell could testify as to TK-7's damages despite the fact that he had no familiarity with the British market for fuel additives. In Bolton, the plaintiff was an adhesive manufacturer who sued the designer of an allegedly defective boiler. The plaintiff claimed that the boiler caused extensive damage to its business. To support its claims, plaintiff presented the expert testimony of an accountant. The accountant testified that he assigned dollar values to the items of damage claimed by the plaintiff. Id. at 545. He assumed that the areas of loss claimed by the plaintiff were valid and legitimate. Id. In reviewing the district court's decision to admit the accountant's testimony, the First Circuit noted that the accountant did not claim to be an expert on the underlying items of damage that he assumed; he merely assigned a monetary value to them. The court rejected the defendant's argument that this assumption made the accountant's testimony inadmissible. The court noted that the accountant's testimony did not have to establish the validity of the disputed claims that he assumed in order for his testimony to be admissible. Id. The appellants in the instant case quote extensively from Bolton and suggest that, in a similar vein, the fact that Dr. Boswell assumed the sales figures projected by D.A. Werber and assigned dollar values to them does not diminish Boswell's testimony in any way.
 
 
 59
 Appellants' argument is good as far as it goes. The fact that Dr. Boswell assumed certain sales figures does not necessarily make his testimony inadmissible. Indeed, this is the classic form of the "hypothetical question," which has long been recognized as a proper method of bringing out expert testimony. In fact, the trial court admitted Dr. Boswell's testimony as to sales in Britain. But appellants stop short of addressing the question of whether the facts assumed by Dr. Boswell were shown by the evidence. Similarly, appellants' selected quotations from the Bolton opinion omit a pertinent statement by that court placing its ruling in context. After concluding that the expert's testimony was admissible notwithstanding the fact that it was based on an assumed fact, the Bolton court noted: "In order to prevail in this action, [plaintiff] had to present evidence tending to establish the disputed fact that [the accountant] assumed." Id. at 546. In the instant case, the plaintiff failed to present evidence tending to establish the sales assumed by Dr. Boswell. The fact that Dr. Boswell relied upon the report in performing his calculation of lost profits did not relieve the plaintiffs from their burden of proving the underlying assumptions contained in the report.
 
 
 60
 After asserting that Dr. Boswell's lack of knowledge of the British market for fuel additives is irrelevant because his only function was to assign monetary values to the projections supplied by D.A. Werber, appellants take another tack and suggest that Dr. Boswell properly adopted the conclusions of D.A. Werber under Rule 703 of the Federal Rules of Evidence, which allows an expert to base an opinion on facts or data not admissible in evidence if of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject. (Citing Indian Coffee Corp. v. Proctor & Gamble Co., 752 F.2d 891 (3rd Cir.1985)). Appellants contend that it was reasonable for Dr. Boswell to adopt Werber's projections, even though they constituted hearsay, because he determined that Werber was an expert. Although the district court admitted Dr. Boswell's opinion without making any findings on the Rule 703 issue, we find that Dr. Boswell's use of the projections to form his opinion as to the amount of lost profits clearly failed to meet the requirements of Rule 703. Dr. Boswell professed no expertise with regard to projecting sales in Britain. He clearly adopted the projections of Mr. Werber. But there is no indication in the record that Dr. Boswell had any familiarity with the methods or reasoning used by Mr. Werber in arriving at his projections. In fact, when Dr. Boswell first submitted his opinion at the time of his deposition, he assumed the validity of the projections made by D.A. Werber despite the fact that he knew little or nothing at all about Werber. Aple.App.Vol. 4 at 690. Although Dr. Boswell testified that he took steps after his deposition "to corroborate" Mr. Werber's projections, the record reveals next to nothing with respect to the substance of those efforts. Based upon the evidence presented in the trial court, Dr. Boswell's assumption of the Werber sales figures cannot be considered "reasonable reliance" for purposes of forming his own opinion of the amount of lost profits. A determination of profits for the joint venture was wholly dependent upon a projection of future sales. By assuming the sales projections made by Werber, Dr. Boswell in essence assumed the very matter at issue on which he was called to express his opinion.
 
 
 61
 Hearsay is normally not permitted into evidence because the absence of an opportunity to cross-examine the source of the hearsay information renders it unreliable. Rule 703 permits experts to rely on hearsay, though, because the expert's "validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes." Rule 703, Advisory Committee Notes. That rationale is certainly not satisfied in this case, where the expert failed to demonstrate any basis for concluding that another individual's opinion on a subjective financial prediction was reliable, other than the fact that it was the opinion of someone he believed to be an expert who had a financial interest in making an accurate prediction.[7] Dr. Boswell's lack of familiarity with the methods and the reasons underlying Werber's projections virtually precluded any assessment of the validity of the projections through cross-examination of Dr. Boswell. Cf. In re: James Wilson Associates, 965 F.2d 160, 173 (7th Cir.1992) (The judge must make sure that the expert isn't being used as a vehicle for circumventing the rule against hearsay.) Moreover, while Boswell testified that he considered the Werber study reliable and adequate, there was no evidence that other experts in his field would rely on such a study and would adopt it for purposes of forming an opinion of the amount of lost profits of an unestablished business. Cf. Wilson v. Merrell Dow Pharmaceuticals, Inc., 893 F.2d 1149, 1153 (10th Cir.1990) (Information must be of a type reasonably relied upon by others in the witness' field of expertise.); 3 J. Weinstein & M. Burger, Weinstein's Evidence p 703 at 703-25 (1988) (The rule implicitly requires that the information be viewed as reliable by some independent, objective standard beyond the opinion of the individual witness.). The record simply does not support appellants' contention that the use of the Werber projections was proper under Rule 703.
 
 
 62
 In addition to the fact that Dr. Boswell's testimony failed to satisfy the requirements under the Federal Rules of Evidence, it also failed to meet the requirement under Oklahoma law that the plaintiff must show lost profit damages with reasonable certainty.[8] We conclude that on the record before us, Dr. Boswell's opinion by itself was insufficient to establish plaintiff's entitlement to damages under the law of Oklahoma. The only proffered basis for Dr. Boswell's opinion that TK-7 suffered lost profits in Britain of over two million dollars was D.A. Werber's projection of TK-7's potential sales. Dr. Boswell did not have sufficient knowledge or expertise to make such a projection himself and, as appellants have acknowledged, Boswell assumed the correctness of Werber's figures in offering his opinion. Dr. Boswell was not able to testify as to the methods or reasoning used by Mr. Werber in conducting his study and could not explain how Werber arrived at a projected market share of five per cent for TK-7 products. In fact, there was a complete lack of admissible evidence in the record showing the basis of the projected sales assumed by Dr. Boswell. Dr. Boswell's attempts to "corroborate" Mr. Werber's projections did not cure this defect because those efforts failed to disclose anything about the justifications for Mr. Werber's projections. In order to establish future lost profit damages with reasonable certainty, the plaintiffs at a minimum were required to present testimony fully explaining how the projection of future sales was calculated and the factors upon which it was based. Such evidence was crucial in light of the potential for speculation in projecting profits of a new business with no history of profits. Although we have assumed for purposes of this opinion that Oklahoma would no longer bar claims of damages for unestablished businesses as a matter of law, plaintiffs are not thereby relieved from their burden of coming forward with evidence to show that the profits they claim are not in the nature of speculation but are justly and reasonably inferred from the evidence presented. See Cook v. Oklahoma Board of Public Affairs, 736 P.2d 140, 153 (Okla.1987) ("Lost profits in such a case will not be awarded where the contractor presented neither evidence of its profits for preceding years nor an expert analysis with a breakdown of damages.") (Emphasis added). Cf. Webb v. Utah Tour Brokers Ass'n., 568 F.2d 670, 677 (10th Cir.1977) (Applying Utah law; evidence did not show tangible foundation from which finder of fact could determine that a reasonable probability existed that profits would have been made.) Because of the nature of the damages claimed, plaintiffs' failure to present the testimony of D.A. Werber, whose opinion as to future sales of the business actually formed the basis of the claim of lost profits, rendered Dr. Boswell's calculations speculative. Cf. Indian Coffee, supra, (Plaintiffs presented expert testimony as to the likely market share of the plaintiff). See also 22 Am.Jur.2d Damages § 627 ("[D]amages may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analysis, and business records of similar enterprises. While some courts tend to reject expert projections, they may be accepted by others if the expert is well qualified and explains his techniques.") (Emphasis added.)
 
 
 63
 No evidence was presented to explain the fundamental assumptions underlying the plaintiffs' claims of future product sales in Britain.[9] Unlike some other types of studies or surveys, the Werber market projections in question here were subjective ones requiring an expert's evaluation of factors likely to affect sales of a product in a foreign market, together with an opinion as to the likely success of the product. Under the circumstances, the plaintiffs failed to demonstrate the reasonable certainty necessary to recover damages by failing to produce a witness capable of offering an opinion as to projected future sales. In short, this is the "best evidence the nature of the case admit[s]" and without it the jury would have no reasonable factual basis for determining lost profits. Cf. Ferrell Construction Co. v. Russell Creek Coal Co., 645 P.2d 1005, 1010 (Okl.1982). Absent evidence showing the basis of their projected sales, the plaintiffs have failed to meet their burden of proof in showing damages.
 
 
 64
 The speculative nature of the damages claimed by the plaintiffs is made clearer by the light of other evidence produced at trial. Although the foreign ventures for which TK-7 claimed lost profits were unestablished businesses, TK-7 itself had been in business in the United States since 1983. The specter of large multimillion dollar profits by TK-7's proposed foreign ventures was wholly inconsistent with the company's record of performance in the United States. The financial statements of TK-7 showed that the company had experienced net losses in every year since its inception. In 1986, prior to any involvement with the Barboutis, the number of employees of TK-7 had gone from 34 down to 8. In 1987, TK-7 lost its major distributor. As of September, 1988, TK-7 had accumulated debts in excess of $1.3 million. In 1989, the Federal Trade Commission filed a complaint alleging that TK-7 had made false and misleading claims in advertisements for fuel additives. Moshe Tal responded with a lawsuit alleging that the FTC had conspired with TK-7's competitors and that the FTC charge had caused an eighty per cent decrease in TK-7's sales. Between 1989 and 1990, numerous federal tax liens were filed against TK-7 and Moshe Tal. In 1990, total gross sales of TK-7 products were down to $80,000. By the time of trial, TK-7 had no employees and had essentially ceased operations. TK-7 transferred the right to sell its products to Tal Technologies, which at the time of trial had two full-time employees, Moshe Tal and one other individual. Plaintiffs submitted no financial or tax records for Tal Technologies.
 
 
 65
 Appellants contend that the testimony of their expert, Dr. Boswell, showed that the above-cited financial history was no indicator of TK-7's true condition and was not indicative of the company's ability to be profitable. The testimony cited, however, only reveals Dr. Boswell's view that a different accounting method would have reduced the losses reported by TK-7, and that it was possible for TK-7 to overcome its accumulated debt and become profitable. It does not in any way support an inference that TK-7 had a history of profitability or that TK-7 was likely to become profitable. Moshe Tal's own assessment of TK-7's prospects at the time that Barboutis became involved with TK-7 was expressed in a letter to TK-7 shareholders concerning the possible buy out by IBI:
 
 
 66
 Though TK-7's sales are lower than what we had hoped, TK-7 is presently soliciting some potentially large accounts, both national and overseas, however, negotiations may drag out for many months or even years. There have been no definite sales yet in this regard. You should also be advised that substantially all sales by TK-7 are through its distributor Energex, which is currently over two months in arrearage to TK-7.
 
 
 67
 In an ongoing attempt to obtain the needed capitalization for TK-7 to be successful or even a viable entity, we have sought private investors in Europe, the United States and Israel. One of these potential private investors is a company known as IBI....
 
 
 68
 After explaining the terms of IBI's proposed buy out, the letter then concluded:
 
 
 69
 Because the prospects for TK-7 are extremely bleak unless IBI is successful, I strongly suggest that all shareholders, especially those shareholders owning less than 100,000 shares each, rapidly submit their shares to me in trust, as outlined.
 
 
 70
 Aple.App.Vol. 5 at 1069, 1072.
 
 
 71
 In addition to TK-7's checkered performance in the United States, other factors only add to the speculative nature of the damages claimed in this case. The joint ventures for which the plaintiffs claim lost profits appear to have been little more than concepts in 1987. For example, there was no written agreement outlining the Werber joint venture and only a "letter of intent" as to the Chacin joint venture. The plaintiffs presented some evidence of the form they believed the proposed joint ventures would take, more so as to the Chacin venture than the Werber venture, but many of the details were sketchy. There were clearly numerous unresolved issues surrounding the establishment of the businesses. See Aple.App.Vol. 5 at 907. No plants or facilities of any kind were secured in either of the two foreign markets where TK-7 hoped to sell its product. Notwithstanding TK-7's claim that it would not be responsible for any of the costs of establishing facilities in those countries, on the record before us one can only speculate as to whether TK-7's joint venture partners would have actually gone forward with the initial proposals. None of those partners testified at the trial. Particularly as to the Werber joint venture, no evidence was presented of any binding commitment on Mr. Werber's part to go forward with the proposal. The details of how TK-7's products would be packaged, shipped, and sold in the foreign markets were not resolved. Also, it is unclear from the record whether the plaintiffs presented evidence to show that its products had been tested and found to be suitable for use in the foreign markets. There were some tests performed on the TK-7 products, but the import of the tests and their results was never explained by the plaintiffs. This failure adds to the speculative nature of the damages in this case because of the many suggestions in the record that the tests that had been completed were only preliminary in nature and that successful results would have to be obtained in more extensive tests in order to sell TK-7 in the foreign markets. See e.g., Aple.App.Vol. 4 at 809; Vol. 5 at 905, 1073, 1105 and 1110. And, despite the fact that the plaintiff claimed that the joint ventures were economically feasible and likely to generate millions of dollars, no evidence was presented of any comparable businesses generating such profits in the foreign markets. In sum, the evidence as a whole reinforces the conclusion that the plaintiffs failed to meet their burden of showing damages with reasonable certainty.
 
 
 72
 V. Appeal No. 91-6384.
 
 
 73
 In a consolidated appeal, the defendants below (Estate of Ihsan Barbouti, et al.) contend that the district court abused its discretion by ordering each side to pay its own costs. Defendants argue that, as the prevailing parties, they should have been awarded costs. They argue that the district court mistakenly concluded that they were just as responsible as the plaintiffs for protracting the litigation in the district court.
 
 
 74
 The district court made extensive findings in support of its decision to require both sides to pay their own costs. Among its findings, the court stated:
 
 
 75
 The Court has carefully considered all of the motions and arguments of the parties, and enters this Order disposing of all the listed matters. The Court feels compelled to note that as was the case prior to trial, there has been, after trial, an inundation of a steady stream of motions seeking some form of relief--specifically those listed above [a total of twenty post trial motions and responses]. Virtually any relief, fee, or sanction that could be requested has been, and a response or objection to it has been filed. The sheer volume of the pleading in this case is evidence of the hostility between these parties. [footnote omitted] The hostility is so great that the Court believes it is clouding counsels' judgment and good sense. Discretion and reason would seem to call for tempering the tone of the requests, if not their number. The attitude of counsel has "fomented litigation" and protracted this case. All counsel are equally guilty of this conduct, and none stands before the Court with clean hands.
 
 
 76
 Dist.Ct.Order of Oct. 24, 1991, at 3. The court concluded: "The Court cannot stress enough that the conduct of all parties to this suit has protracted both the discovery process and the trial, and wasted enormous amounts of the Court's time.... Defendants continue to deny wrongdoing while deluging the Court and opposing counsel with pleadings." Id. at 10.
 
 
 77
 As the defendants concede, we review the district court's ruling only for an abuse of discretion. See Howell Petroleum Corp. v. Samson Resources Co., 903 F.2d 778, 783 (10th Cir.1990). Considering this standard, we have little difficulty in affirming the district court. Defendants' argument that their actions below were the "inescapable result" of the plaintiffs' allegations is amply refuted by both the district court's findings and the voluminous record in this case. We note that in attempting to characterize the district court's ruling as the product of "fatigue" from a "hard-fought case," defendants have not mentioned some of the court's more specific findings, such as the court's determination that the defendants had previously attempted to circumvent a court order--an attempt which the court characterized as "both unprofessional and unconscionable." Dist.Ct.Order at 3-4, n. 2. The district court's ruling was supported by the record and was not an abuse of discretion.
 
 
 78
 VI. Conclusion.
 
 
 79
 For the reasons set forth herein, the judgment of the district court granting the defendants a directed verdict, is AFFIRMED. Likewise, the district court's order directing both sides to bear their own costs is AFFIRMED.
 
 
 
 *
 Honorable Wesley E. Brown, United States Senior District Judge for the District of Kansas, sitting by designation
 
 
 [1]
 Appellants' Motion to Strike appellees' letter and supplemental appendix is granted in part. The letter will be stricken insofar as it contains argument. Appellees' Supplemental Appendix will be stricken; the materials contained therein have not been considered in our decision
 
 
 [2]
 Under the agreement, Tal was to attempt to purchase outstanding shares of TK-7 stock on behalf of IBI. IBI was then to reimburse Tal for any shares he purchased. Tal was also to obtain assignments of loans owed by TK-7 to shareholders as well as other TK-7 obligations and IBI was to assume those loans and obligations. Once IBI obtained thirty per cent of the outstanding shares of TK-7 stock, IBI had the option of forgiving the obligations owed by TK-7. In exchange, TK-7 was to issue additional shares of stock to IBI in sufficient number to give IBI a majority of the outstanding shares
 
 
 [3]
 See Executive Order 12543, January 7, 1986, 51 Fed.Reg. 875. Plaintiffs alleged that the conspiracy would also have violated this Executive Order by supporting industrial or government projects in Libya. Plaintiffs further argued that the alleged conspiracy would have violated Executive Order 12544, January 8, 1986, 51 Fed.Reg. 1235, which prohibited the Government of Libya and its agencies from owning property within the United States
 
 
 [4]
 The report states: "As a result of the September 2, 1987 meeting and subsequent follow-up with Lagovin, S.A., Humberto Penaloza (former President of Petroleos De Venezuela) and German Chacin feel that our TK-701 will be Lagovin's choice, if we present favorable test results on TK-701's detergent effectiveness, using the Venezuela gasoline." Aplt.App.Vol. 2 at 374. The report then states that Lagovin produces 150,000 barrels per day of gasoline and projects that TK-7's gross revenue from sales of TK-701 to Lagovin would be $138,600 per month
 
 
 [5]
 See Wilson, 939 F.2d at 271: "Double hearsay in the context of a business record exists when the record is prepared by an employee with information supplied by another person. [I]f the source of the information is an outsider ... Rule 803(6) does not, by itself, permit the admission of the business record. The outsider's statement must fall within another hearsay exception to be admissible because it does not have the presumption of accuracy that statements made during the regular course of business have."
 
 
 [6]
 At the end of the projections contained in the Werber report, the following statement is set forth: "Assumption: 1. 5% market share of road hauler industry in U.K." Aple.App.Vol. 5 at 909. It is not clear from the report whether this figure represented Mr. Werber's prediction of the market share that TK-7 was likely to capture or whether it was simply used as an illustration. The report contains no explanation for the assumption. Another document apparently written by Mr. Werber was also introduced into evidence. This latter document, a one-half page telex, appears to contain market share projections of two per cent for TK-7 in "year one," followed by five per cent the next year and seven-and-a-half per cent the next year. Id. at 901. The telex does not explain how these figures were determined
 
 
 [7]
 When asked to explain why he believed Mr. Werber's projections would be reliable, Dr. Boswell stated: "They would be very valid, very reliable in the sense that they were done for business purposes for people who were considering making an investment. So, therefore, they had a personal direct interest in those being reliable and they were not done for litigation purposes. They were made for the long term. They were going to make investments and they wanted to be sure the data was reasonable before they committed their funds." Aplt.App.Vol. 2 at 658
 
 
 [8]
 For the same reasons discussed above concerning the predictions of sales in Great Britain, any error on the part of the district court in excluding Dr. Boswell's opinion as to Venezuelan damages was harmless
 
 
 [9]
 We note that, contrary to appellants' suggestions, even if Dr. Boswell's reliance on the Werber report had been proper under Rule 703, the report itself could not be used to establish TK-7's probable sales in the British market. When an expert relies on hearsay information to form an opinion, "[t]he hearsay is admitted for the limited purpose of informing the jury of the basis of the expert's opinion and not for proving the truth of the matter asserted." Wilson v. Merrell Dow Pharmaceuticals, Inc., 893 F.2d 1149, 1153 (10th Cir.1990) (emphasis added). Thus, the Werber report cannot sustain the plaintiffs' claimed damages