BRIAN K. EPPS, UNITED STATES MAGISTRATE JUDGE
Sharon Hanson suffered from pleural mesothelioma and ovarian cancer allegedly caused by exposure to asbestos in Defendant's Cashmere Bouquet Body Talc ("CB talc"). Before the Court is a series of motions to exclude testimony by scientific and medical experts. (Doc. nos. 51, 52, 56, 60, 67, 118, 120, 132, 133, 172.) After careful consideration of the briefs, evidence, and oral argument, the Court
(1) DENIES AS MOOT Plaintiff's motion to exclude evidence of Dr. Ronald Gordon's felonious past;
(2) EXCLUDES Plaintiff's expert Dr. Gordon's opinions CB talc is contaminated with asbestos and caused Mrs. Hanson's pleural mesothelioma ;
*1277 (3) EXCLUDES the causation opinions of Plaintiff's experts Drs. Richard Kradin and Jacqueline Moline because of their reliance on Dr. Gordon's now excluded opinion CB talc is contaminated with asbestos;
(4) EXCLUDES Plaintiff's expert Dr. James Webber's opinions regarding alleged Cosmetic, Toiletry, and Fragrance Association ("CTFA") misconduct during its collaboration with EPA in development of the J4-1 test method;
(5) DENIES Defendant's motion to preclude admission into evidence of vintage CB talc containers;
(6) ALLOWS defense expert Dr. Matthew Sanchez's opinions regarding the absence of asbestos in CB talc and biological benignity of cleavage fragments;
(7) ALLOWS defense expert Dr. Brooke Mossman's opinions regarding threshold levels of asbestos exposure and biological benignity of cleavage fragments;
(8) DENIES Plaintiff's motion to exclude reference to six articles Dr. Mossman cited for the first time during her deposition and DENIES AS MOOT Plaintiff's motion to exclude statements by Dr. Mossman that are critical of Plaintiff's expert Dr. Arnold Brody; and
(9) ALLOWS defense expert Dr. Suresh Moolgavkar's opinion age was Mrs. Hanson's biggest risk factor for mesothelioma and CB talc was not a risk factor.
I. FACTUAL AND PROCEDURAL BACKGROUND
A. Amended Complaint Allegations
Seeking compensatory and punitive damages, the Amended Complaint asserts claims under Georgia law against Defendant Colgate-Palmolive Company, as manufacturer of CB talc, for negligence, product liability, breach of warranty, loss of consortium, and wrongful death. (Doc. no. 200, pp. 6-17.) The Amended Complaint alleges Mrs. Hanson's exposure to asbestos occurred through her and her mother's use of CB talc during the period of 1952 through 1974. (Id. at 4, 6-7.) Mrs. Hanson's mother used CB talc daily, and Mrs. Hanson's exposure occurred through contact with her mother, inhalation of suspended particles during application, and contact with surfaces upon which CB talc settled. (Id. at 7.)
Mrs. Hanson personally used CB talc daily from 1962 through 1970, and her exposure occurred through direct contact with her skin and inhalation of talc particles suspended in the air during application. (Id. ) Mrs. Hanson and her mother did not know CB talc contained asbestos and would not have used CB talc had they known. (Id. at 8-9.) Mrs. Hanson was diagnosed with ovarian cancer in the Fall of 2009 and with pleural mesothelioma in the Fall of 2014, which led to the realization in the Summer of 2015 that CB talc could cause ovarian cancer and pleural mesothelioma. (Id. at 5.) Mrs. Hanson died on April 21, 2018, at the age of sixty-six. (Doc. no. 148-55, pp. 7:25-8:1; doc. no. 195.)
B. Key Mineralogy Concepts
The Food and Drug Administration ("FDA") regulates talc powder as a cosmetic, defined as an "articl[e] intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to the human body or any part thereof for cleansing, beautifying, promoting attractiveness, or altering the appearance ...." 21 U.S.C. § 321(i) ; 21 C.F.R. § 73.1550. The Federal Food, Drug, and Cosmetic Act prohibits (1) adulteration of cosmetics in interstate commerce; (2) introduction, *1278 delivery, and receipt of adulterated cosmetics in interstate commerce; and (3) manufacture of adulterated cosmetics. 21 U.S.C. § 331.
Federal regulations promulgated by the Occupational Safety and Health Administration ("OSHA") and the Environmental Protection Agency ("EPA") define asbestos as the asbestiform variety of the following six naturally occurring minerals: chrysotile, amosite, crocidolite, anthophyllite, tremolite, and actinolite. 29 C.F.R. § 1910.1001 ; 40 C.F.R. § 763.163 ; Occupational Exposure to Asbestos, Tremolite, Anthophyllite, and Actinolite, 57 Fed. Reg. 24310-01, 24316 (June 8, 1992) ; James R. Millette, Asbestos Analysis Methods, in Asbestos: Risk Assessment, Epidemiology, and Health Effects, 42 (Ronald F. Dodson, et al., eds., 2d ed. 2011) [hereinafter "Millette 2011"]. Chrysotile belongs to the serpentine family of minerals, and the remaining five belong to the amphibole family of minerals. Occupational Exposure to Asbestos, Tremolite, Anthophyllite, and Actinolite, 57 Fed. Reg. at 24316 ; Millette 2011 at 42.
The shape or form a crystal takes during crystallization as determined by environmental and geological conditions is described as its "habit." Occupational Exposure to Asbestos, Tremolite, Anthophyllite, and Actinolite, 57 Fed. Reg. at 24316. The asbestiform crystallization habit is unusual because it requires unique temperature and pressure conditions inducing unidirectional and rapid crystal growth and formation of long thread-like fibers with aspect ratios of 20:1 to 100:1 and higher. Id.; Millette 2011 at 42. Asbestiform fibers bend like a wire under pressure, and they are polyfilamentous, meaning they grow in bundles. Occupational Exposure to Asbestos, Tremolite, Anthophyllite, and Actinolite, 57 Fed. Reg. at 24316. Asbestiform fibers have many commercial applications because of their stability in acids and alkalies, thermal and electrical insulating properties, and high tensile strength. Id. Asbestiform and nonasbestiform amphibole minerals have the same chemical composition and crystal structure, and the sole difference is caused by unique crystallization of the asbestiform habit. Id.; (Gordon Dep. 5/1/2017, doc. no. 147-23, pp. 42:18-43:8). Nonasbestiform prismatic crystals are the common crystal habits of amphiboles. Occupational Exposure to Asbestos, Tremolite, Anthophyllite, and Actinolite, 57 Fed. Reg. at 24316.
A mineral particle formed by breakage is called a cleavage fragment. Id.; (WHO IARC Monograph, doc. no. 63-1, p. 13; EPA Region IX Response, doc. no. 147-18, p. 14). While asbestiform fibers typically separate from their populations when crushed or milled, non-asbestiform minerals break into fragments along their plane of growth. Occupational Exposure to Asbestos, Tremolite, Anthophyllite, and Actinolite, 57 Fed. Reg. at 24316. Some commentators contend non-asbestiform cleavage fragments occur in similar dimensions as asbestiform cleavage fragments. Id. at 24317-19. Others contend this is not true except for infrequent occasions when a non-asbestiform cleavage fragment has an abnormally high aspect ratio or an asbestiform fibril has an abnormally low aspect ratio. Id. Plaintiff argues, citing EPA Region IX's Response to the November 2005 National Stone, Sand & Gravel Association Report, the distinction between asbestos fibers and cleavage fragments is artificial and meaningless for the purpose of evaluating health hazards. (Doc. no. 147, p. 7 (citing EPA Region IX Response, p. 14).)
C. Asbestos Detection Standards
The United States Pharmacopeia ("USP") method is FDA's standard test *1279 for detecting the presence of asbestos in talc. See 21 C.F.R. § 73.1550(b) ("Talc shall meet the specifications for talc in the United States Pharmacopeia XX (1980) ...."). To distinguish a fiber as asbestos rather than a cleavage fragment, talc, or an accessory mineral, an analyst uses optical microscopy to identify asbestos fibers with the following three characteristics:
1) a range of length to width ratios of 20:1 to 100:1, or higher, for fibers longer than 5 µm;
2) capable of splitting into very thin fibrils; and
3) two or more of the following characteristics:
(i) parallel fibers occurring in bundles;
(ii) fiber bundles displaying frayed ends;
(iii) fibers in the form of thin needles; or
(iv) matted masses of individual fibers and/or fibers showing curvature.
(USP Monograph, doc. no. 145-1, p. 6.)
The FDA Monograph Modernization Task Group is considering revisions to the USP Monograph to ensure "the tests for asbestos have adequate specificity" to detect the presence of asbestos in talc. (Doc. no. 72-2, p. 2.) The task is still underway, and the USP Monograph remains the industry standard for detection of asbestos in talc. (Doc. no. 185, p. 80.)
EPA applies a similar standard to analyze bulk building materials for asbestos in EPA R-93, entitled Method for the Determination of Asbestos in Bulk Building Materials , which defines an asbestos fiber as follows:
1) Mean aspect ratios ranging from 20:1 to 100:1 or higher for fibers longer than 5 µm. Aspect ratios should be determined for fibers, not bundles.
2) Very thin fibrils, usually less than 0.5 micrometers in width, and
3) Two or more of the following:
(i) Parallel fibers occurring in bundles,
(ii) Fiber bundles displaying splayed ends,
(iii) Matted masses of individual fibers, and/or
(iv) Fibers showing curvature.
(EPA R-93, doc. no. 143-4, p. 71.) EPA R-93 explains, "It is not unusual to observe occasional particles having aspect ratios of 10:1 or less, but it is unlikely that the asbestos component(s) would be dominated by particles (individual fibers) having aspect ratios of < 20:l for fibers longer than 5µm." ( Id. )
Other organizations and agencies have different length and aspect ratio standards, examples of which are as follows:
OHSA : A countable fiber is equal to or longer than 5µ (microns) and has an aspect ratio (length-to-width ratio) of equal to or greater than 3:1;
MSHA (Mine Safety and Health Administration) : A countable fiber is equal to or longer than 5µ (microns) and has an aspect ratio (length-to-width ratio) of equal to or greater than 3:1;
EPA/AHERA (Asbestos Hazard Emergency Response Act) : A structure greater than or equal to .5µ in length with an aspect ratio of 5:1 or greater and having substantially parallel sides.
(Doc. no. 60, p. 6.)
D. Plaintiff's Criticisms of Asbestos Detection Standards
At the core of Plaintiff's case is the contention traditional methods for defining and detecting asbestos are too lenient and allow harmful asbestos to be ignored and unreported in talc powder. Plaintiff challenges the USP method because it allegedly *1280 (1) lacks analytical sensitivity to detect the presence of asbestos; (2) ignores fibers with aspect ratios less than 20:1; and (3) requires a fiber to be found in a larger population of fibers exhibiting at least two characteristics of asbestos, i.e. parallel fibers occurring in bundles, fiber bundles displaying splayed ends, matted masses of individual fibers, and fibers showing curvature. (Id. at 9-12.) Plaintiff alleges these requirements are inappropriate for talc powder because the milling of talc shortens the aspect ratios and removes fibers from bundles. (Id. at 12-13.)
Consistent with Plaintiff's theory, Dr. Ronald Gordon, Plaintiff's expert electron microscopist, argues the USP method is "totally inadequate to assess ... talcum powders." (Gordon Dep. 5/1/2017, p. 80:1-5.) Accordingly, Dr. Gordon eschews the USP method and analyzed CB talc for asbestos utilizing a modified version of the Yamate method developed for the purpose of identifying and measuring the concentration of airborne asbestos fibers through electron miscroscopy. (Gordon, et al., 2014 Article, doc. no. 147-30, p. 3; Yamate Method, doc. no. 63-8, pp. 1-2, 6, 13-15.)
E. The Yamate Method for Detecting Asbestos
The Yamate method consists of three levels, and the analyst determines the number of levels to perform based on the information sought and level of effort deemed acceptable. (Yamate Method, pp. 6, 15.) Levels I, II, and III require approximately 200, 400, and 1,200 minutes per analysis, respectively. (Id. at 18.) Before beginning Level I, the analyst prepares a sample and places it on an electron microscope grid containing 100 grid openings. (Id. at 21-28, 38-45, 58.) The grid is three millimeters per side, approximately the size of a pencil eraser. (Id. at 27; Hearing Trans. 10/24/2017, doc. no. 185, p. 6.) For this initial work, Dr. Gordon removed CB talc from the containers, suspended the fibers in distilled water and ethanol, and dripped the solution over the grid to distribute fibers randomly over the 100 grid openings. (Gordon, et al., 2014 Article, p. 3.)
1. Yamate Level I
Level I analyzes each sample by morphology and selected area electron diffraction ("SAED") pattern recognition and is appropriate to screen many samples for asbestos because it is a "relatively rapid procedure." (Yamate Method, pp. 6, 15, 17.) First, because asbestiform and non-asbestiform amphiboles may have similar elemental and crystalline characteristics, an analyst must distinguish them on the basis of morphology. (Id. at 60.) To perform a morphology analysis, the analyst views a grid opening with an electron microscope and determines if an asbestos fiber, bundle, cluster, or matrix is located within the opening. (Id. at 29.) An asbestos fiber is "a particle with an aspect ratio of 3:1 or greater, with substantially parallel sides." ( Id. ) An asbestos bundle is a "particulate composed of fibers in a parallel arrangement, with each fiber closer than the diameter of one fiber." ( Id. ) An asbestos cluster is "a particulate with fibers in a random arrangement such that all fibers are intermixed and no single fiber is isolated from the group." ( Id. ) An asbestos matrix is "a fiber or fibers with one end free and the other end embedded or hidden by a particulate." (Id. at 30.)
Second, the analyst performs SAED analysis, which determines the crystal structure of a particle by viewing the diffraction pattern created when the electron beam in the microscope passes through the particle. (Id. at 31-32.) Comparing the diffraction pattern of the fiber with an SAED pattern obtained from an asbestos standard sample, the analyst classifies the particle as chrysotile, amphibole group, ambiguous, or "no identification." ( Id. )
*1281 2. Yamate Level II
Level II consists of an elemental analysis of the particles by energy dispersive spectrometer ("EDS"), and the author states Level II is sufficient for regulatory action but not anticipated litigation. (Id. at 6, 15, 17, 49.) EDS obtains a spectrum of the x-rays generated by the particle that reveals elements present in the structure. (Id. at 49.) The spectrum profile is compared with profiles of known particles to determine whether it corresponds to a form of asbestos. ( Id. ) EDS is "semiquantitative at best" because "asbestos has a varying elemental composition" and other variables can affect the results. (Id. at 51.)
3. Yamate Level III
Level III requires "a quantitative SAED analysis from two different near-exact zone-axis orientations on a selected number of fibers ...." (Id. at 6, 15, 56.) Because of its rigor, Level III is appropriate for "confirmatory analysis of controversial samples" and required if "legal proceedings are anticipated." (Id. at 6, 15, 17.) Unlike the SAED analysis required at Level I, the Level III SAED analysis requires "tilting of the specimen to align major crystallographic directions with the electron beam." (Id. at 62-63.) Such an alignment is called a "zone axis" and is a "line parallel to a set of intersecting crystal planes and nearly parallel to the electron beam." (Id. at 63.) The SAED pattern created at the zone axis "gives regular repeat distances and even intensities of spots throughout the pattern," thus better enabling the analyst to quantify the SAED pattern. ( Id. )
Zone axis SAED is important because identification of a particle "may not be absolute" based on the single zone-axis orientation at Level I. (Id. at 56.) Furthermore, unlike the visual comparison at Level I, the analyst must measure the location of the spots on the resulting diffraction pattern at the zone-axis orientation to obtain the d-spacings-distances between the crystal planes measured in angstroms-and the corresponding interplanar angles. (Id. at 67-70.) The analyst compares the d-spacings and angles to measurements from known minerals. (Id. at 59.) Because of the rigorous requirements of a quantitative SAED analysis, "Level III analysis should always be conducted by or under the close supervision of a professional electron microscopist knowledgeable in crystallography, SAED analysis, mineralogy, plus Level I and Level II asbestos analyses." (Id. at 57.)
4. Other Yamate Specifications
The Yamate method states the minimum counting rule is a "minimum 100 fibrous structures per known area (complete grid opening) or 10 grid openings, whichever is first." (Id. at 17 (quotation omitted).) However, the method recommends counting ten grid openings from two grids, a total of twenty grid openings, for "very low asbestos presence, or for asbestos contamination studies." ( Id. ) Additionally, the Yamate method states data should be recorded "in a systematic form" on data sheets to promote ease in data reduction and subsequent reporting of results. (Id. at 33, 50.) The exemplar data sheets indicate the first piece of data to be reported is the grid opening where the fiber structure was found by simply noting the number of the grid opening on the data sheet. (See id. at 94, 98.)
5. Dr. Gordon's Yamate Modifications
Dr. Gordon modified the Yamate method in at least four important ways. First, he did not record the grid openings of fibers he determined to be asbestos. Second, rather than reviewing ten grid openings per grid, Dr. Gordon reviewed all 100 grid openings in every grid of CB talc he tested. Third, Dr. Gordon did not observe the minimum detection limit, which requires an analyst to locate at least five fibers in a *1282 sample of ten grid openings per grid before he or she can report a positive finding of asbestos, reasoning that if he checked every one of the 100 grid openings he could make a positive finding after locating even one fiber. Fourth, Dr. Gordon did not perform Level III analysis on any of the CB talc samples, but instead stopped at Level II.
II. STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY
Admissibility of expert testimony is governed by Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny. Rule 702 provides:
A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.
Fed. R. Evid. 702. The three broad requirements of Rule 702 are qualifications, reliability, and helpfulness. United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc ).
When evaluating the reliability of scientific expert testimony, the trial court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and ... whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592-93, 113 S.Ct. 2786. In assessing reliability, a trial court has "considerable leeway" in deciding which tests or factors to use. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). In Daubert, the Supreme Court suggested a trial court consider "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." Daubert, 509 U.S. at 593-95, 113 S.Ct. 2786. Trial courts must remain mindful " Daubert does not require certainty; it requires only reliability." Hendrix ex rel. G.P. v. Evenflo Co., 609 F.3d 1183, 1198 n.10 (11th Cir. 2010). The focus of reliability "must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595, 113 S.Ct. 2786.
Expert testimony must also help the trier of fact to understand the facts in evidence or to determine a fact in issue. This consideration "goes primarily to relevance." Id. at 591, 113 S.Ct. 2786. Expert testimony is helpful "if it concerns matters that are beyond the understanding of the average lay person." Frazier, 387 F.3d at 1262 (citing United States v. Rouco, 765 F.2d 983, 995 (11th Cir. 1985) ). Expert testimony also does not help the trier of fact when "a large analytical leap must be made between the facts and the opinion." McDowell v. Brown, 392 F.3d 1283, 1299 (11th Cir. 2004).
The Daubert analysis "is not intended to supplant the adversary system or the role of the jury." Allison v. McGhan, 184 F.3d 1300, 1311 (11th Cir. 1999). Where the basis of expert testimony satisfies Rule 702, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate *1283 means of attacking [debatable] but admissible evidence." Daubert, 509 U.S. at 596, 113 S.Ct. 2786.
III. CHALLENGES TO PLAINTIFF'S EXPERTS AND EVIDENCE
A. The Court Excludes the Product Contamination and Specific Causation Opinions of Dr. Ronald Gordon
Having a Ph.D. in experimental biology and pathology, Dr. Gordon is a Research Professor and Director of Electron Microscopy within the Department of Pathology at Mount Sinai's Icahn School of Medicine. (Gordon Dep. 3/20/2015, doc. no. 147-1, p. 172:11-14; Gordon Expert Rep., doc. no. 65, pp. 3, 21.) Dr. Gordon teaches college courses in electron microscopy, pathology, and biology, has authored or co-authored more than 150 publications, serves as reviewer for several peer review journals, and reviews grant applications for seven institutions including the National Institutes of Health and National Science Foundation. (Gordon Expert Rep., pp. 3, 23-24, 32-47, 50-52.)
1. The Court Denies As Moot Plaintiff's Motion Regarding Admissibility of Dr. Gordon's Felonious Past and Denials of Same Under Oath
Arrested in September 1992 for conspiracy to commit money laundering and bank fraud, Dr. Gordon agreed to cooperate with the government and entered the witness protection program. (Gordon Reyes Testimony I 7/8/1993, doc. no. 64-8, pp. 175:3-6; Gordon Reyes Testimony II 7/8/1993, pp. 275:1-4, 277:12-19, 278:14-19.) At trial of his coconspirators, Dr. Gordon admitted he engaged in "criminal activity regarding drugs and drug laundering money" by arranging for issuance and cashing of falsified checks. (Gordon Reyes Testimony I 7/8/1993, pp. 180:4-7.) In an April 2012 civil deposition, however, Dr. Gordon testified he had never been arrested. (Gordon Dep. 4/23/2012, doc. no. 186-1, pp. 181:23-182:19.) One year later, Dr. Gordon denied in a deposition having ever falsified documents or testified in any capacity other than an expert witness. (Gordon Dep. 4/18/2013, doc. no. 61-5, pp. 19:5-11, 84:11-12.)
By motion in limine, Plaintiff argues these unfortunate events are improper impeachment material because they occurred a long time ago, there was no conviction, and there is a high risk of prejudice, citing decisions excluding this evidence. (Doc. no. 172, pp. 2-6.) Because the Court excludes the heart of Dr. Gordon's testimony below for unrelated reasons, the present motion is DENIED as MOOT . Should the case proceed to trial, Plaintiff may renew the motion by the deadline for filing motions in limine.
2. The Court Excludes Dr. Gordon's Opinion CB Talc Is Contaminated with Asbestos
Dr. Gordon's contamination opinion originates in his 2014 study and article entitled "Asbestos in Commercial Cosmetic Talcum Powder as a Cause of Mesothelioma in Women." (Gordon Expert Rep., p. 5.) Utilizing the modified Yamate method described in § I.E. supra , Dr. Gordon tested more than fifty containers of alleged CB talc and reported asbestos in all, specifically anthophyllite, tremolite, and chrysotile. (Id. ) Dr. Gordon also analyzed tissue samples of women who developed mesothelioma without any known exposure to asbestos except CB talc and found asbestos correlating with the types he found in CB talc. (Id. ) Based on a fiber burden analysis of Mrs. Hanson's ovaries and lungs, Dr. Gordon opines "all the containers of Cashmere Bouquet talcum powder ... contained asbestos fibers of the same type found in Mrs. Hanson's lungs and gynecologic tissues." (Id. at 13.)
*1284 Defendant argues Dr. Gordon's talc contamination opinion is unreliable because (1) testing talc for asbestos is outside his expertise of diagnosing disease by examining human tissue; (2) the modified Yamate method deviates from the industry standard USP Monograph for Talc; (3) he failed to address the risk of false positives by foregoing Yamate Level III; (4) he did not record the location of fibers found to be asbestos; (5) he ignored the method's detection limit of five fibers per sample; and (6) he improperly extrapolated his findings to all CB talc ever manufactured. (Doc. no. 56, pp. 16-24.) The Court excludes Dr. Gordon's opinion because of items three and four and finds the remainder more appropriate for cross examination.
a. Dr. Gordon's Failure to Record the Location of Alleged Asbestos Fibers Renders His Opinion Unreliable
Defendant argues its experts cannot replicate and test Dr. Gordon's findings because he did not record the grid location of each fiber he determined to be asbestos, in violation of Yamate reporting protocols. (Doc. no. 56, p. 22; see also Gordon Dep. 3/20/2015, doc. no. 64-1, pp. 166:17-23, 131:4-7.) Instead of analyzing ten or twenty grid openings per sample as Yamate recommends, Dr. Gordon analyzed between 500 and 3,000 grid openings for each of approximately 138 samples taken from approximately fifty CB talc containers, resulting in a range of 69,000 to 414,000 grid openings analyzed. (See Gordon Dep. 3/20/2015, p. 163:12-18; doc. nos. 151-6 through 151-13.) The Yamate method requires the analyst to systematically record data for all detected fibers, even providing a suggested form to record the grid opening information. (Yamate Method, pp. 33, 50, 94, 98.)
Dr. Gordon admits he did not bother to record the location of the reported fibers and concedes another expert reviewing his work would have no way of knowing which grid openings he determined to contain asbestos fibers. (Gordon Dep. 3/20/2015, p. 165:3-10.) At best, as Dr. Gordon admits, another analyst could only reconstruct the entire project by inspecting each of the thousands of grid openings and guessing whether a particular grid opening was one Dr. Gordon identified as containing an asbestos fiber. (Id. at 165:3-10, 131:8-18.) While Dr. Gordon did take visual images of each alleged asbestos fiber, another expert would have no idea which grid opening correlates with each image. (Id. ) Dr. Gordon admits "chances are" another analyst would not be able to locate the grid opening containing the fiber he identified and his decision to not record the locations would make a defense expert's task more difficult. (Id.; Gordon Dep. I 4/18/2013, doc. no. 147-11, p. 220:8-17.)
By failing to record location, Dr. Gordon ensured no other analyst could replicate his work and test his findings, as he understands having explained testing talc powder for asbestos is "like looking for a needle in a haystack." (Gordon Jackson Testimony, 2/13/2017, doc. no. 61-7, pp. 121:20-122:3.) Without location information, Dr. Gordon's findings are supported merely by his personal assurance he found asbestos fibers somewhere in the thousands of grid openings. This is exactly the sort of chicanery and ipse dixit the Court must exclude. See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (finding expert opinion inadmissible if connected to data only by ipse dixit of expert); Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc., 282 F.R.D. 655, 667 (M.D. Fla. 2012)aff'd , 725 F.3d 1377 (Fed. Cir. 2013) (finding expert's failure to document testing procedures strongly weighed against reliability); United States v. Hebshie, 754 F.Supp.2d 89, 125 (D. Mass. 2010) ("Documentation is necessary to test a hypothesis;
*1285 in fact, reproducibility is the sine qua non of 'science.' ").
Plaintiff argues defense experts are not prejudiced because Dr. Gordon tested all 100 grid openings per grid, produced all grids, and produced fiber analysis worksheets containing an image and EDS spectrum for each reported asbestos fiber. (Doc. no. 147, p. 13; see Gordon Expert Rep., pp. 72-87.) The argument ignores the scant effort required of Dr. Gordon to record the grid coordinates and the costly guessing game he foisted on defense experts when he produced thousands of grid openings with no indication of which correlate with his worksheets, images, and EDS spectra. Plaintiff also points to the acknowledged risk of damage to grids that may render replication difficult or impossible even when an analyst records location. (Doc. no. 147, pp. 13-14.) They never offer an example of where this occurred in the case sub judice. (Id.; doc. no. 189, p. 9.) Even if they could, the immense and needless difficulty caused by Dr. Gordon's methodical failure to record grid opening locations is not ameliorated by other inherent replication difficulties.
Plaintiff argues defense experts would never agree the reported fibers are asbestos even if located because (1) Dr. Gordon applies a broad definition of a particle 5µ or longer with an aspect ratio of at least 3:1 or 5:1; and (2) defense experts apply a narrower definition requiring a population of fibers longer than 5µ with an aspect ratio of at least 20:1. But for Dr. Gordon's omission of location information, Defendant could have analyzed the fibers identified as asbestos, referenced Dr. Gordon's images and EDS spectra for that fiber, and formed an opinion concerning the soundness of Dr. Gordon's findings under all arguably applicable definitions and standards. The debate could have occurred on a level playing field with all material facts available to everyone as contemplated by Daubert and its progeny. Because such a debate cannot be had, omission of the location information is sufficient by itself to exclude Dr. Gordon's contamination opinion.
b. Because Dr. Gordon Skipped Yamate Level III, He Did Not Distinguish Talc from Asbestos Reliably
Defendant also argues Dr. Gordon's modified Yamate method is unreliable because he failed to perform Yamate Level III, and this final step is necessary to distinguish talc from asbestos reliably. (Doc. no. 56, pp. 10-12.) By stopping at Level II, Defendant argues, Dr. Gordon may have identified fibers as asbestos that may have been revealed as harmless talc particles at Level III. (Id. ) Defendant is correct. Talc is a widely known interference in asbestos testing that can generate false positives according to many sources including American Society for Testing and Materials ("ASTM") International, World Health Organization ("WHO"), and EPA. (ASTM Draft Protocol, doc. no. 61-13, p. 5; Kremer, et al., 1990 Article, doc. no. 63, p. 4; WHO IARC Monograph, p. 13; Krause 1978 Article, doc. no. 63-3, pp. 13-14; EPA R-93, pp. 44-46.) As WHO explains, "[t]alc platelets on end and talc intergrown with amphibole in fibrous talc have complex electron diffraction patterns that may resemble other silicates, including amphiboles ... unless carefully indexed." (WHO IARC Monograph, p. 13.) Accordingly, a zone-axis SAED analysis is necessary to distinguish amphiboles from talc and prevent false positives. (Id. )
Yamate Level III is the only level that employs a zone-axis SAED analysis. (Yamate Method, p. 44.) Yamate Levels I and II test for morphology and elemental chemistry, but Dr. Gordon admits talc and anthophyllite can be similar morphologically and have a similar if not identical chemical structure. (Gordon Dep. 2/12/2015, doc.
*1286 no. 63-10, p. 344:16-19; Gordon Dep. II 7/9/2013, doc. no. 64, pp. 334:19-335:12.) Furthermore, Dr. Gordon even concedes talc can produce an SAED pattern similar to amphiboles at certain orientations. (Gordon Dep. II 7/9/2013, pp. 335:13-336:13)
While Dr. Gordon opines the pattern will not be similar if the electron beam hits the fiber perpendicular to the flat side, he concedes one must still perform a dual-zone access analysis to ensure the analyst is not looking at the wrong orientation. (Id. ) Yet, Dr. Gordon chose not to perform the Yamate Level III zone-axis SAED analysis for his product testing. (Gordon, et al., 2014 Article, p. 3.) Nor is he qualified to do so because Yamate Level III requires expertise in crystallography, and Dr. Gordon has no such expertise. (Gordon Dep. 4/18/2013, p. 47:21-23; Yamate Method, p. 57.) Compounding the problem created by Dr. Gordon's omission of Yamate Level III is his decision to not record the grid opening locations of fibers he identified as asbestos, which renders it impossible for any defense expert to find those fibers and conduct Yamate Level III to rule out false positives.
Plaintiff advances three arguments in support of his contention Dr. Gordon's opinion is reliable despite his decision to forego Yamate Level III. None are convincing. First, Plaintiff argues the Yamate method does not require a Level III analysis when legal proceedings are anticipated. (Doc. no. 147, p. 13.) In direct contradiction, the Yamate method states "If a legal proceeding is anticipated, Level III analysis will be required ...." (Yamate Method, p. 17.) Even if the Yamate method stated otherwise, it would not change this Court's finding Dr. Gordon's failure to perform Yamate Level III renders his opinion unreliable under Daubert and its progeny.
Second, Plaintiff argues former defense experts Messrs. Van Orden and Saldivar did not perform Yamate Level III in past cases. (Doc. no. 147, pp. 10, 12.) Regarding the prior case cited by Plaintiff, Mr. Van Orden testified he obtained "SAED patterns with zone axis diffraction patterns" and used them as the "primary criterion for identification" of the particles. (Van Orden Dep. 9/22/2016, doc. no. 147-26, pp. 20:25-21:13; Van Orden Expert Rep., doc. no. 150-6, pp. 2-3.) Mr. Saldivar has never used the Yamate method when testing for asbestos in talc. (Saldivar Dep. 3/13/2015, doc. no. 147-31, pp. 49:2-50:14, 11:12-25, 25:23-26:8.) Furthermore, Mr. Saldivar testified he "tilt[ed] the sample" any time he obtained a hexagonal diffraction pattern in order to rule out anthophyllite and ensure the accuracy of his finding. (Id. at 125:19-126:2.)
Third, Plaintiff argues Dr. Gordon's skipping of Yamate Level III only benefits Defendant because Level III would only change the outcome if a fiber appears to be talc at Level II but is actually anthophyllite at Level III. (Doc. no. 185, pp. 83-86.) This is because (1) tilting what appears to be anthophyllite at Level III to obtain the zone axis diffraction pattern may reveal that it is actually talc; and (2) talc, in contrast, will produce the same diffraction pattern regardless of the tilt. (Id. ) Both during the hearing and in his post-hearing brief, Plaintiff pointed unequivocally to Dr. Millette's 2015 article entitled "Procedure for the Analysis of Talc for Asbestos," to support its contention Level III can only eliminate false negatives and cannot eliminate false positives. (Id. at 83; doc. no. 189, p. 5; Millette 2015 Article, doc. no. 189-3, p. 7.) Plaintiff misreads the article.
The critical excerpt from Dr. Millette's article provides as follows:
Table 4 in the draft Yamate document (23) lists [-1 4 2] as a reference zone axis for anthophyllite. With d1 and d2 both at 4.56 angstroms and an angle of *1287 60°, this pattern is very close to the zone axis measured on a typical pseudo-hexagonal pattern obtained from a talc plate. Therefore, a fiber cannot be considered to be anthophyllite on the basis of a zone axis index match of the [-1 4 2] alone. Fortunately, a talc fiber can be differentiated from an anthophyllite fiber because the talc pattern remains evident as the talc particle is tilted, but the pattern changes when an anthophyllite fiber is tilted.
(Millette 2015 Article, p. 7.) The second sentence explains anthophyllite can display a diffraction pattern, with d-spacings and a corresponding interplanar angle, "very close" to talc when analyzed at the reference zone axis of [-1 4 2]. This means the analyst could at first believe a fiber to be anthophyllite when it is talc or believe it to be talc when it is anthophyllite. Accordingly, as the third sentence explains, one cannot determine a fiber to be anthophyllite based on a match at the reference zone axis alone. As the final sentence explains, one must tilt the fiber to reveal its true identity because the diffraction pattern will remain the same if the fiber is talc but the diffraction pattern will change if it is anthophyllite.
Quite obviously, therefore, an initial finding of talc will change to anthophyllite if the pattern changes, and an initial finding of anthophyllite will change to talc if the pattern does not change. Dr. Millette's observations are entirely consistent with the Yamate method, which requires analysis of two zone-axis orientations because identification of a particle "may not be absolute" based on SAED patterns from a single zone-axis orientation. (Yamate Method, p. 56.) They are also consistent with Dr. Millette's acknowledgement in an earlier article talc is an interference that "must be distinguished from positively identifiable asbestos" when testing using an electron microscope. (Kremer, et al., 1990 Article, p. 4.) Also worthy of a second mention is the WHO IARC Monograph, which states talc may resemble amphibole asbestos unless carefully indexed. (WHO IARC Monograph, p. 13.)
The Court thus excludes Dr. Gordon's product contamination opinion for the second and independent reason he failed to distinguish talc from anthophyllite reliably by skipping Yamate Level III. Notably, Defendant filed a secondary motion to exclude Dr. Gordon's contamination opinion that is, from the Court's perspective, largely redundant of the primary motion and irrelevant in light of the conclusions reached above. The Court thus DENIES the secondary motion as MOOT . (Doc. no. 52.)
3. Dr. Gordon's Specific Causation Opinion Is Unreliable
Dr. Gordon's causation opinion is as follows: "Based on my review of Mrs. Hanson's pathology material including lung and gynecological tissue provided to me, and my findings, I state to a reasonable degree of scientific certainty that Mrs. Hanson's exposures to asbestos fibers, including anthophyllite asbestos, was a substantial contributing factor in the development of her malignant mesothelioma and ovarian cancer." (Gordon Expert Rep., p. 2.) Plaintiff later stipulated Dr. Gordon will not opine regarding ovarian cancer. (Gordon Dep. 5/1/2017, p. 80:1-5.)
General causation considers "whether an agent increases the incidence of disease in a group" and is not a point of serious debate when the toxin is generally recognized as causing the alleged injury. McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1242-43 (11th Cir. 2005). A general causation inquiry is unnecessary here because Plaintiff makes the widely accepted claim asbestos causes mesothelioma rather than claiming talc powder itself causes mesothelioma. (Gordon Expert Rep., p. 13; Gordon Dep. 5/1/2017, p. 82:12-21.) Specific *1288 causation is the battleground, and it considers whether (1) the plaintiff was exposed to enough of the toxin to cause the alleged injury; (2) the chronological relationship between exposure and effect is biologically plausible; and (3) the likelihood the chemical caused the injury in the context of other known causes. Chapman v. Procter & Gamble Distrib., LLC, 766 F.3d 1296, 1306 (11th Cir. 2014) ; McClain, 401 F.3d at 1242-43.
With respect to specific causation, i.e. Plaintiff's burden of proving Mrs. Hanson's mesothelioma was in fact caused by her exposure to asbestos in talc power, the International Expert Meeting on Asbestos, Asbestosis, and Cancer published an article in 1997 entitled "Asbestos, asbestosis, and cancer : the Helsinki Criteria for diagnosis and attribution." (Helsinki Criteria Article, doc. no. 70.) The purpose of the group was "to discuss disorders of the lung and pleura in association with asbestos and to agree upon state-of-the-art criteria for their diagnosis and attribution with respect to asbestos." (Id. at 2.) Regarding attribution of mesothelioma to asbestos exposure, the Helsinki Criteria provides:
A lung fiber count exceeding the background range for the laboratory in question or the presence of radiographic or pathological evidence of asbestos-related tissue injury (e.g., asbestosis or pleural plaques ) or histopathologic evidence of abnormal asbestos content (e.g., asbestos bodies in histologic sections of lung) should be sufficient to relate a case of pleural mesothelioma to asbestos exposure on a probability basis.
(Id. at 4.) "In the absence of such markers, a history of significant occupational, domestic, or environmental exposure to asbestos will suffice for attribution." (Id. )
Because Dr. Gordon concedes there was never a diagnosis of asbestosis or pleural plaques and he did not observe asbestos bodies, the Helsinki Criteria require a finding Mrs. Hanson had (1) a lung fiber count exceeding the background range established by a valid control group; or (2) significant domestic exposure to asbestos by use of CB talc. (Gordon Dep. 5/1/2017, pp. 16:10-15, 59:25-60:18.) Concerning the first prong, Dr. Gordon reported a total of three anthophyllite asbestos fibers in Mrs. Hanson's lung tissue samples. (Id. at 71:16-19.) From these three fibers, he extrapolated the level of anthophyllite in Mrs. Hanson's lungs to be 3,450 fibers per gram wet weight. (Id. at 72:9-12; Gordon Expert Rep., p. 13.) Comparing this fiber burden with the background range established by his control group, Dr. Gordon opines Mrs. Hanson's level of asbestos "significantly exceed[s] background levels." (Gordon Expert Rep., p. 13.) With regard to the second prong, Dr. Gordon relied on his finding CB talc contains asbestos and tests he conducted to determine the level of exposure caused by consumer use of CB talc.
The Court agrees with Defendant that Dr. Gordon's specific causation opinion is unreliable for four reasons. First, Dr. Gordon failed to record the grid opening where he found the three anthophyllite fibers in Mrs. Hanson's tissue, just as he failed to do when finding anthophyllite in CB talc. (Gordon Dep. 5/1/2017, p. 73:14-17.) This glaring omission renders unreliable his entire fiber burden analysis. Second, Dr. Gordon's finding of anthophyllite in Mrs. Hanson's lungs, and by extension his fiber burden calculation, relies on the same flawed Yamate method that skips Level III and fails to eliminate the risk of falsely identifying talc as anthophyllite. (Id. at 52:6-9.). Third, Dr. Gordon's opinion of Mrs. Hanson's significant domestic exposure to asbestos through use of CB talc, relevant to the second Helsinki criterion, runs headlong into the Court's exclusion in § III.A.2. supra , of his opinion CB talc *1289 contains anthophyllite, leaving no basis for finding any asbestos exposure.
Fourth, with respect to the first Helsinki criterion, Dr. Gordon's finding of above-background asbestos levels in Mrs. Hanson's lungs relies on a control group of his own creation for which there are too many unanswered questions and hallmarks of impropriety. Dr. Gordon's current control group consists of thirty-five patients who have been "documented" not to have any evidence of asbestos exposure based on "histories taken by trained individuals, trained MDs ...." (Id. at 128:9-16.) But Dr. Gordon does not have any documentation of their medical or exposure histories. (Id. at 139:2-11.) Documentation is limited to age range, gender, a list of "means and ranges," and fiber analysis worksheets. (Id. at 139:9-11; 140:23-141:16.) Dr. Gordon has never submitted his control group to the scientific community or had the group peer reviewed. (Id. at 136:25-138:1.)
While it is true a valid control group must consist of persons without lung disease who have no history of exposure to asbestos, Dr. Gordon's entire control group is pristine with respect to asbestos, meaning no one returned a tissue sample with any countable asbestos fibers. (Gordon Brandt Testimony 7/12/2017, doc. no. 67-3, p. 28:2-4.) Dr. Gordon admits there is no control group in the world other than his where the members have no countable asbestos fibers. (Id. at 27:4-15.) Dr. Gordon explains "no other laboratory depends on results that are even current" and "if they did it the way I did it, they probably would" have no countable asbestos fibers in their control group. (Id. )
Dr. Gordon's control group previously exceeded 200 people and had members with countable asbestos fibers. (Id. at 16:23-25.) Dr. Gordon admits "some" of the decrease from 200 to thirty-five occurred when he discovered members had countable asbestos fibers, and he further admits none of those removed suffered an asbestos-related disease necessitating their removal from the control group. (Id. at 18:5-8.) Dr. Gordon explains the reduction from 200 to thirty-five patients was warranted because he never found anybody with countable asbestos fibers caused by background sources since the 1980s. (Id. at 17:5-10.) Nevertheless, Dr. Gordon has co-authored studies where countable asbestos fibers were detected in tissue of the background group. (Id. at 18:9-12.)
Dr. Gordon admits the amount of background asbestos can vary depending on where a person lives. (Gordon Dep. 5/1/2017, p. 135:3-6.) Nevertheless, even though asbestos would be part of the ambient air for a person living near a factory using or producing asbestos products, according to Dr. Gordon, the person could not represent "true background." (Id. at 130:14-20.) Thus, Dr. Gordon testified only people who have "never had any contact with asbestos of any kind" can create "true background levels." (Id. at 131:6-8.) As a result, a finding of a single countable asbestos fiber exceeds the background established by Dr. Gordon's current control group. (Id. at 127:14-16.)
Dr. Gordon's control group appears from the circumstances to be a creation of his own making designed to generate a pristine environment where a single countable asbestos fiber exceeds background levels. The control group has not been peer reviewed, and Dr. Gordon's penchant for little to no documentation of his work makes it impossible for defense experts to conduct a meaningful review of the selection process for the original group of 200 or the winnowing to the current group of thirty-five. The Court has no reasonable assurance the control group accurately reflects background levels in the general population.
*1290 For all of these reasons, the Court excludes Dr. Gordon's specific causation opinion. (Doc. no. 67.)
4. Other Courts Have Excluded Dr. Gordon's Contamination and Specific Causation Opinions
This is not the first occasion courts have excluded Dr. Gordon's asbestos contamination and specific causation opinions. See Brandt v. The Bon-Ton Stores, Inc., No. 2987, 2017 WL 4271039 (Pa. Com. Pl. Sept. 25, 2017) (excluding Dr. Gordon's talc contamination opinion because of failure to conduct Yamate Level III, and excluding causation opinion because control group is small, insufficiently documented, and unreliable); Green v. Acans, Inc., No. 24x15000563, slip. op. at 1 (Md. Cir. Ct. May 16, 2017) (excluding Dr. Gordon's opinions regarding CB talc contamination and specific causation); Cade v. Union Pacific R.R. Co., No. CI 12-393, slip. op. at 7 (Neb. Dist. Ct. Feb. 18, 2015) (excluding Dr. Gordon's specific causation opinion based on control group of thirty-five due to lack of transparency, absence of peer review, and absence of general acceptance within scientific community).
B. The Court Excludes the Causation Opinions of Drs. Kradin and Moline Because of Their Reliance on Dr. Gordon's Product Contamination Opinion and Prior Scientific Findings of Asbestos in Talc
Dr. Kradin, board certified in internal medicine, anatomic pathology, and pulmonary medicine, is a professor of pathology and medicine at Harvard Medical School and an adjunct faculty member at Pacifica University. (Kradin CV, doc. no. 154-1, pp. 2-3.) Dr. Kradin serves on the editorial board of five journals and has authored or coauthored more than 120 medical publications. (Id. at 4, 8-18.) Dr. Moline, board certified in occupational and environmental medicine, is a Professor of Occupational Medicine, Epidemiology & Prevention, and Internal Medicine at Hofstra Northwell School of Medicine and an adjunct professor at Mount Sinai School of Medicine. (Moline CV, doc. no. 154-2, p. 3.) She is Director of the World Trade Center Clinical Center of Excellence and has authored or coauthored more than sixty medical publications. (Id. at 4, 21-25.)
Dr. Kradin' opinions are as follows:
It is ... my opinion that both [Mrs. Hanson's] ovarian carcinoma and her malignant mesothelioma were caused by her cumulative exposures to asbestos and that these exposures were caused by the contamination of Cashmere bouquet [sic] cosmetic talc by amphibole asbestos (anthophyllite), as noted in the digestion study performed by Dr. Gordon and the section on cosmetic talc in this report.
Although her tumor cells show a mutation in the BRCA2 gene, this does not negate the fact that she was repeatedly exposed to asbestos, which can independently cause ovarian cancer.
(Kradin Expert Rep., doc. no. 119-5, p. 33.) Dr. Moline's opinions are as follows:
M[r]s. Hanson also developed ovarian cancer, which is associated with exposure to asbestos. While she does have a genetic predisposition to the development of ovarian cancer (BRCA2 mutation ), this does not negate the fact that she was repeatedly exposed to asbestos, which can independently cause ovarian cancer.
(Moline Expert Rep., p. 25.) Dr. Kradin will testify regarding general and specific causation while Dr. Moline limits her opinions to general causation. (Doc. no. 185, pp. 310-11.)
Defendant first contends there are no scientific studies linking ovarian cancer to asbestos exposure. (Doc. nos. 118, 167.) On the contrary, Drs. Kradin and Moline cite *1291 many scientific articles linking asbestos exposure to ovarian cancer. (Kradin Expert Rep., pp. 22-23; Moline Expert Rep., pp. 31-32; see also doc. no. 154, pp. 8-11.)
Defendant next contends Dr. Kradin failed to conduct a proper analysis to exclude other potential causes of Mrs. Hanson's mesothelioma, including most importantly her BRCA2 gene mutation. (Doc. no. 118, pp. 12-15.) A differential diagnosis considers all potential causes of an injury systematically eliminates them. Chapman, 766 F.3d at 1308 (citing McClain, 401 F.3d at 1252 ). "Although a reliable differential diagnosis need not rule out all possible alternative causes, it must at least consider other factors that could have been the sole cause of the plaintiff's injury." Guinn v. AstraZeneca Pharmaceuticals LP, 602 F.3d 1245, 1253 (11th Cir. 2010). The following deposition excerpts confirm Dr. Kradin properly considered Mrs. Hanson's gene mutation and determined asbestos still played a significant role in her mesothelioma :
I think, as I just mentioned, the etiology of cancer is -- is complex, and certainly there are individuals who have pre -- genetic predispositions to developing cancer. So I would say the BRCA gene mutation that runs in her germline is certainly a factor that would predispose her, but in the absence of other mutative agents I'm not certain that she would definitely have developed cancer. So there are environmental factors and age related factors as well as the genetic factors. That's -- That's the state of the art with respect to neoplasia ....
I would say [Mrs. Hanson's BRCA2 gene mutation is] a predisposing element that would increase her risk of developing an ovarian cancer, but I certainly cannot exclude an environmental contribution, in this case her exposure to asbestos ....
All I can say is that having the BRCA gene certainly predisposed her. I don't think the BRCA gene by itself would be sufficient; that the fact that -- the fact that asbestos has been shown now, I think, by a consensus of medical opinion to be a cause of ovarian cancer would implicate asbestos as at least a contributory factor to the development of her ovarian malignancy as well ....
I think what -- what research cancer biologists would suggest -- And I brought this article by Doctor Vogelstein to support it - is that the general pathways for the development of cancer require at least -- at least three mutations, the BRCA mutation being one in -- in -- in this case, the other two being questionable, but with asbestos being a recognized cause of this -- of ovarian cancer it would have to be implicated. So the BRCA gene by itself probably does not produce cancer. There need to be additional mutative events in order for the cancer to develop ....
It's my opinion that these [asbestos] exposures [from her use of CB talc] are the cause of her mesothelioma and contributory cause of her ovarian cancer.
(Kradin Dep., doc. no. 148-59, pp. 63:24-64:24, 101:5-13, 103:19-104:6, 132:18-20.) Dr. Kradin opines BRCA2 and asbestos exposure were both significant in the development of mesothelioma. Defendant's criticisms are more appropriate for cross examination.
Finally, the Court must consider the impact on Drs. Kradin and Moline of excluding Dr. Gordon's product contamination opinion. Both physicians rely on Dr. Gordon's now excluded opinion CB talc contains asbestos. Without it, they have no basis for opining Mrs. Hanson's use of CB talc caused her cancer. Because the Court has excluded Dr. Gordon's opinion, these physicians obviously cannot rely on it. See *1292 § III.A, supra ; see also Rink v. Cheminova, Inc., 400 F.3d 1286, 1294 (11th Cir. 2005) (affirming exclusion of toxicology experts who "relied on [another expert]'s findings, which we have found to be unreliable"); Jones v. Novartis Pharm. Corp., 235 F.Supp.3d 1244, 1295 (N.D. Ala. 2017), aff'd in part sub nom. Jones v. Novartis Pharm. Co., 720 F. App'x 1006 (11th Cir. 2018) (excluding specific causation opinion relying on stricken general causation opinions).
Drs. Kradin and Moline also rely on findings talc products from the source mines for CB talc were contaminated with asbestos fibers, as stated in a 1976 article by Drs. Rohl and Langer and a 2014 article by Dr. Gordon. (Kradin Expert Rep., pp. 18-20; Moline Expert Rep., pp. 29-31.) Defendant moves to strike their reliance on these articles. They cannot rely on the 2014 article by Dr. Gordon because it reports the same product contamination opinion excluded supra. Drs. Kradin and Moline cannot offer a meaningful opinion concerning the soundness of the methodologies and conclusions stated in the 1976 article, and they are not qualified to offer opinions concerning the presence of asbestos in CB talc or the extent of Plaintiff's exposure. Even a cursory review of their depositions confirms these topics are completely outside their specialized expertise of medical causation. (Kradin Dep. 9/10/2017, doc. no. 52-8, pp. 35:25-38:3, 45:10-46:24, 47:13-48:18, 52:22-53:10, 53:11-18, 54:12-25; 59:14-19, 75:20-76:17, 77:10-12; Moline Dep. 5/2/2017, doc. no. 52-6, pp. 17:14-17, 29:6-15, 32:10-20 102:6-15, 122:8-123:4; Moline Dep. 6/6/2017, pp. 180:4-9, 190:18-22.).
Allowing them to parrot findings concerning these topics from the 1976 article would improperly relieve Plaintiff of his burden to prove the presence of asbestos in CB talc and Plaintiff's exposure to the same, which are the most hotly contested issues in the case. "An expert 'may not simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon.' " Hernandez v. Crown Equip. Corp., 92 F.Supp.3d 1325, 1352 (M.D. Ga. 2015) (quoting In re Polypropylene Carpet Antitrust Litigation, 93 F.Supp.2d 1348, 1357 (N.D. Ga. 2000) ). "Particularly when parties do not have the opportunity to examine the information relied upon, courts must ensure that an expert witness is sufficiently familiar with the reasoning or methodology behind the information to permit cross-examination." In re Polypropylene Carpet Antitrust Litigation, 93 F.Supp.2d at 1357 (citing TK-7 Corp. v. Estate of Barbouti, 993 F.2d 722, 732-33 (10th Cir. 1993) ). Applying this rule, the court in Carpet Antitrust excluded an expert's opinion to the extent it relied on conclusions of another expert because the testifying expert failed to demonstrate a valid basis for concluding the report was reliable and showed no familiarity with the methods and reasons underlying the hearsay report.
C. The Court Disallows Dr. Webber's Testimony Regarding Alleged CTFA Misconduct in its Dealings with FDA
Dr. Webber is an environmental health scientist with training, education, and experience in toxicology, epidemiology, and environmental health hazards. (Webber Expert Rep., doc. no. 51-1, pp. 2-4; Webber CV, doc. no. 51-4.) During his illustrious career, Dr. Webber started an asbestos analysis laboratory, developed asbestos laboratory accreditation programs for New York state, and authored or critically reviewed many publications regarding airborne asbestos control and screening. (Webber Expert Rep., pp. 2-4; Webber CV, pp. 2-10.) From 2008 to 2014, Dr. Webber chaired the ASTM International *1293 Committee D22, Air Quality , which writes standards for sampling and analysis of air. (Webber CV, pp. 2-10.) In 2011, Dr. Webber began his tenure on the U.S. Pharmacopeia Talc Expert Panel, the panel that is evaluating analytical methods best suited for detection of asbestos in talc. (Id. )
Based on his review of historical FDA documents from the 1970s, Dr. Webber opines CTFA (1) proposed to collaborate with FDA to develop a reliable method for detection of asbestos in talc; (2) failed to share with FDA the results of a test series in which six out of seven laboratories, utilizing CTFA's J4-1 test method, failed to detect tremolite asbestos known to be in the samples; and (3) failed to remedy the problem. (Webber Expert Rep., pp. 10-13.) The CTFA J4-1 method became the cosmetic talc industry's method for assuring asbestos-free talc for four decades. (Id. ) Dr. Webber opines FDA was unaware of the J4-1 method's analytical shortcomings based on documents such as a 1986 letter in which FDA cited "its cooperation with the talc industry such that an 'analytical methodology was sufficiently developed' to assure that 'talc be free of fibrous amphibole ....' " (Id. )
Dr. Webber is qualified to testify concerning analytical methods to determine the presence of hazards to human health such as asbestos in talc powder. However, there is an unbridgeable gap between (1) Dr. Webber's expertise and experience; and (2) his opinions regarding CTFA's historical collaboration with FDA and effectiveness of FDA's oversight of the talc industry. Dr. Webber has never had any job responsibilities related to policymaking or regulatory functions, has never worked for CTFA, FDA, or any company in the cosmetics industry, and has no firsthand knowledge of CTFA or FDA. (Webber Trial Test. 11/14/2016, doc. no. 51-5, p. 92:7-25; Webber CV.) Dr. Webber did not take part in any CTFA discussions in the 1970s concerning the testing of cosmetic talc for asbestos. (Webber Trial Test. 11/14/2016, p. 92:18-21.)
Dr. Webber does not know whether FDA has regulatory authority concerning cosmetics and cosmetic talc and "imagine[d] it is zero." (Webber Dep. 5/31/17, pp. 240:21-241:1.) Dr. Webber also does not know "offhand" what FDA is, nor did he know the regulatory authority FDA holds over cosmetic talc now or exercised when it collaborated with CTFA in the 1970s. (Id. at 241:7-242:1.) When asked what professional expertise he brought to interpretation of the minutes from the CTFA talc subcommittee reports, Dr. Webber replied, "I'm just using the words right there that to me in common English say that we are going to do it when the time is right for us." (Id. at 84:4-85:15.)
Because Dr. Webber's expertise and experience do not inform his opinion, the Court excludes his testimony. See Lopez v. Allstate Fire & Cas. Ins. Co., No. 14-20654-CIVCOOKTORRES, 2015 WL 5584898, at *6 (S.D. Fla. Sept. 23, 2015) (finding expert must explain how his experience leads to opinion, why experience is sufficient basis for opinion, and how experience is reliably applied to case facts); Kaufman v. Pfizer Pharm. Inc., No. 1:02-cv-22692, 2011 WL 7659333, at *7 (S.D. Fla. Aug. 4, 2011) (explaining expert's experiences and expertise must inform her opinions).
Even if Dr. Webber had expertise regarding FDA regulatory oversight of the talc industry, there would be no benefit to the jury for him to summarize correspondence and explain conclusions he draws solely from that correspondence. Jurors can review the documents and draw their own conclusions. See Frazier, 387 F.3d at 1263 (explaining expert testimony must offer something beyond understanding of average citizen.);
*1294 Omar v. Babcock, 177 F. App'x 59, 63 (11th Cir. 2006) (explaining testimony unnecessary if expert merely recounts facts and offers conclusion jury should reach); see also Dugas v. 3M Co., No. 3:14-CV-1096-J-39JBT, 2016 WL 7327666, at *3 (M.D. Fla. Mar. 30, 2016) (explaining expert testimony unnecessary where jury can read documents and reach own conclusions).
Nor for similar reasons may Dr. Webber testify regarding the fact or frequency of asbestos contamination in the source talc mines for CB talc, or the extent of asbestos contamination in CB talc. Based on his review of twelve historical documents dating from 1942 through 1977 reporting asbestos in consumer talc products and talc ores, and Dr. Gordon's product testing, Dr. Webber opines "tremolite, anthophyllite, and chrysotile asbestos had been detected ... in several talc ores and talc products." (Webber Expert Rep., p. 10.) Dr. Webber concedes, however, he is not a geologist and is not qualified to offer an expert opinion on the mining or milling of talc. (Webber Dep. 5/31/2017, pp. 31:3-6, 64:20.) Dr. Webber "couldn't give ... a detailed description" of the mining and milling processes for talc. (Id. at 24:10-12.) Dr. Webber is merely pulling information from historical documents and borrowing Dr. Gordon's findings rather than applying any of his considerable expertise or experience. Indeed, he has no expertise or experience regarding the extent or degree of asbestos contamination in CB talc or its source mines. (See generally Webber Expert Rep.) Accordingly, Dr. Webber's testimony on these subjects is inadmissible.
D. The Court Overrules Defendant's Objection to Admission of CB Talc Containers Because Federal Rule of Evidence 901 Does Not Apply
Invoking Federal Rule of Evidence 901, Defendant objects to admission of vintage CB talc containers from which Dr. Gordon obtained his samples because they "cannot be authenticated as genuine Cashmere Bouquet in its original condition." (Doc. no. 120, pp. 2, 9-11.) Plaintiff contends Rule 703 applies rather than Rule 901 because, rather than seeking admission of the containers, they "seek to introduce expert opinion testimony based on the results of testing those materials ...." (Id. )
Rule 901 applies to authentication of "an item of evidence." Fed. R. Evid. 901. Rule 703 applies where, as here, a party presents expert analysis of the item but does not enter the item into evidence. See United States v. Woods, 684 F.3d 1045, 1062 (11th Cir. 2012) (holding no authentication needed where expert opined regarding pictures but did not seek to admit them); see also 29 Victor James Gold, Federal Practice and Procedure Evidence § 6273 (2d ed. 2017) ("[R]ule 703 determines what is a proper basis for expert opinion."); Broussard v. Maples, 535 Fed. App'x 825, 828-829 (11th Cir. 2013) (comparing Rule 702 and 703 ). Because Defendant objected under Rule 901 only, and there is a paucity of argument concerning Rule 703, the Court DENIES the motion. (Doc. no. 120.)
IV. CHALLENGES TO DEFENSE EXPERTS
A. The Court Allows Dr. Sanchez's Opinions Regarding the Absence of Asbestos in CB Talc and Biological Benignity of Cleavage Fragments
Dr. Sanchez holds a Ph.D. in geology and specializes in characterization of asbestos in raw materials and building products, and development of asbestos analytical methods. (Sanchez Expert Rep., doc. no. 60-3, p. 2.) In addition to having tested thousands of talc samples for asbestos, Dr. Sanchez performs human tissue digestion and fiber burden studies by light and electron microscopy for the presence of asbestos.
*1295 (Sanchez Trial Test. 7/19/16, doc. no. 143-2, p. 85:21-26; Sanchez Expert Rep., p. 2.) Dr. Sanchez serves on the USP Talc Expert Panel, which in collaboration with ASTM is currently drafting asbestos testing methods for cosmetic and pharmaceutical grade talcs. (Sanchez Expert Rep., p. 2-3.)
Applying the USP Monograph's requirements regarding fiber populations rather than individual fibers, Dr. Sanchez and his colleagues found no asbestos in more than seventy containers of CB talc. (Id. at 18.) Dr. Sanchez also used the Yamate method to examine CB talc, except he completed Level III rather than stopping at Level II, and found no asbestos. (Id. ) Plaintiff argues (1) Dr. Sanchez's narrow definition of asbestos is not used by health and regulatory bodies to make health assessments; and (2) he has no scientific foundation to conclude the fibers he identified as non-asbestos or cleavage fragments lack biological potency. (Doc. no. 60, p. 2.)
The Court rejects Plaintiff's arguments because Dr. Sanchez's determination of what constitutes countable asbestos complies with the USP Monograph for Talc, his primary test method that is generally accepted and adopted by FDA to test talc for the presence of asbestos. (Webber Dep. 3/14/17, doc. no. 145-2, p. 87:7-11; Webber Dep. 7/18/16, doc. no. 145-3, p. 67:4-16; Webber Jackson Test. 2/13/2017, doc. no. 145-4, p. 100:5-9); see also 21 C.F.R. § 73.1550(b). Because Plaintiff's criticisms of USP and Dr. Sanchez are best reserved for cross examination, the Court DENIES the motion to exclude his testimony.
B. The Court Allows Dr. Mossman's Opinions Regarding Threshold Levels of Asbestos Exposure and Biological Benignity of Cleavage Fragments
Dr. Mossman has a Ph.D. in Cell Biology from the University of Vermont and is a Professor of Pathology at the University of Vermont. (Mossman Expert Rep., p. 5.) She has studied the role of asbestos in the induction of lung cancers, asbestosis, and mesotheliomas for more than forty years. (Id. ) Dr. Mossman opines "[p]eer reviewed research ... and dose-response studies, including my own, support the existence of a threshold level of exposure to asbestos necessary for disease causation." (Id. at 3.) In support, Dr. Mossman cites (1) experimental studies demonstrating no observed adverse effects from exposure to certain levels of asbestos; and (2) a 2011 monograph discussion of demonstrations in research "that asbestos fibers at high concentrations act epigenetically rather than as mutagens." (Id. (citation omitted).)
Dr. Mossman opines "there is a threshold for exposure that must be met for different types of asbestos" but the limit cannot be easily quantified because it depends on a host of variables. (Mossman Dep. 9/26/16, doc. no. 132-2, pp. 45:23-47:20.) Because asbestos exposure is dose-dependent, scientists determine risk by utilizing a number of variables including the source, fiber length, dissolution of material, asbestiform structures, surface properties, valence, and iron availability. (Id. at 46:2-47:5.) Therefore, "there is no magic number" that can be assigned to the threshold limit value. (Id. at 49:2-16.)
Plaintiff contends Dr. Mossman's opinion should be excluded because her inability to specify a numerical value of exposure below which mesothelioma will not occur renders her testimony "manifestly unhelpful" to a jury. (Doc. no. 132, pp. 6-7.) That Dr. Mossman cannot define a precise numerical threshold does not render her opinion unhelpful. To meet his burden of proof, Plaintiff must demonstrate Mrs. Hanson was exposed to asbestos from a product made or sold by Defendant at a *1296 dose sufficient to cause her disease. Dr. Mossman's testimony, based on peer-reviewed research and dose-response studies, will aid the jury in evaluating Plaintiff's causation evidence. Indeed, Plaintiff has his own expert, Dr. Jacqueline Moline, who will testify "there ... is no threshold that has been determined below which you can say a specific quantity" of asbestos is safe. (Moline Dep. 7/8/2011, doc. no. 140-3, p. 29:9-23; Moline Expert Rep. doc. no. 119-6, p. 22.) It is the province of the jury to determine the credibility of these competing experts.
Plaintiff also contends Dr. Mossman failed to recognize exposure to asbestos below the level of detection is nonetheless harmful, pointing to her statement she used "[t]alc, including talc with amphibole cleavage fragments and fibrous talc" in her laboratory as a "negative control particle for research concerning the biological potency of asbestos minerals." (Doc. no. 132, pp. 7-10; Mossman Expert Rep., p. 4.) However, Dr. Mossman's report explains "[i]n vitro and animal studies demonstrate that cleavage fragments show no adverse biologic effects" because "[l]ong, thin, fibrous geometry is important in critical steps leading to cancer development whereas cleavage fragments are inactive." (Mossman Expert Rep., pp. 3-4.) She further explains "[e]xperiments have consistently revealed that non-asbestiform cleavage fragments of amphiboles or serpentine are inactive, regardless of endpoints examined, including cell proliferation and cell death (cytotoxicity ) (reviewed in Mossman, 2008)." (Id. at 4.) In her opinion, "[r]esearch supports the opinion that cleavage fragments, even those chemically similar to pathogenic asbestos minerals, do not cause mesotheliomas." (Id. )
Dr. Mossman cites multiple studies in support of her conclusion non-asbestiform cleavage fragments are not harmful. (Id. at 3-4.) Plaintiff disagrees, citing studies finding exposure to asbestos in doses below the detection limit may be harmful. (Doc. no. 132, pp. 7-10.) It is best for the jury to declare a victor in the expert battle concerning whether cleavage fragments traditionally not defined as asbestos cause cancer given their chemical likeness but morphological dissimilarity to asbestos. For these reasons, Dr. Mossman's testimony regarding threshold exposure and non-asbestiform cleavage fragments are sufficiently reliable for admission at trial.
Plaintiff raises two related issues concerning Dr. Mossman. First, Plaintiff moves to exclude Dr. Mossman's discussion of six articles she did not list in her expert report but identified to Plaintiff's counsel as additional reliance materials at her July 10, 2017 deposition. (Id. at 4-6.) Because the articles merely provide additional support for opinions timely disclosed by Dr. Mossman, there is no prejudice suffered as a result of the late disclosure. However, Plaintiff may seek leave of court to conduct a second deposition limited to these articles fourteen days prior to any pre-trial conference. Second, Plaintiff seeks to exclude any statements by Dr. Mossman that are personally critical of Dr. Arnold Brody. (Id. at 10-12.) Defendant does not intend to offer such testimony, and Plaintiff's motion as to this issue is moot.
C. The Court Allows Dr. Moolgavkar's Opinions Age Was Mrs. Hanson's Biggest Risk Factor for Mesothelioma and Talc Was Not a Risk Factor
Dr. Moolgavkar has a Ph.D. in Mathematics with postdoctoral training in Pharmacology, Biophysics, Epidemiology, and Biostatistics. (Moolgavkar Expert Rep., doc. no. 139-1, pp. 2-3.) In addition to a Ph.D., Dr. Moolgavkar holds an M.B. B.S., the British system equivalent to M.D. (Id. )
*1297 Dr. Moolgavkar currently serves as a Senior Fellow and Principal Scientist at Exponent, Inc., an international consulting company. (Id. ) Prior to joining Exponent, Dr. Moolgavkar was a Professor of Epidemiology and Adjunct Professor of Biostatistics at the University of Washington. (Id. )
Dr. Moolgavkar was instrumental in developing a biologically-based mathematical model for quantitative estimation and prediction of cancer risk, known formally as the two-stage clonal expansion ("TSCE") model and informally as the Moolgavkar-Venzon-Knudson ("MVK") model. (Id. at 3.) Cancer researches worldwide utilize the MVK model to study the impact of age and environmental factors on the risk of cancer. (Id. at 3, 14-15.) Dr. Moolgavkar has published more than 170 papers, including papers discussing carcinogenesis following exposure to fibers such as asbestos. (Id. at 3-4.)
Dr. Moolgavkar summarizes his opinions as follows:
1. Most cases of pleural mesothelioma among women in the U.S. are not attributable to asbestos exposure.
2. Ms. Hanson's risk of developing spontaneous mesothelioma in her mid-to-late-fifties was approximately 25- to 30-fold the risk at age 30.
3. Alleged exposure to asbestos from cosmetic talc made no contribution to the development of Ms. Hanson's mesothelioma.
4. From the material provided to me, Ms. Hanson's mesothelioma arose spontaneously as a consequence of naturally occurring biological processes; age was the strongest risk factor contributing to the development of Ms. Hanson's pleural mesothelioma.
(Id. at 31.) Plaintiff challenges items two through four and also argue Dr. Moolgavkar is not qualified to testify regarding the spontaneity of mesothelioma. (Doc. no. 133.)
1. Dr. Moolgavkar Is Qualified
Plaintiff asserts Dr. Moolgavkar "has no relevant qualifications or expertise to offer the opinion that Mrs. Hanson's mesothelioma was 'spontaneous' " because he is an epidemiologist and biostatician rather than a medical doctor or molecular/cellular biologist. (Id. at 7-8.) "Epidemiology, a field that concerns itself with finding the causal nexus between external factors and disease, is generally considered to be the best evidence of causation in toxic tort actions." Kilpatrick v. Breg, Inc., 613 F.3d 1329, 1337 n.8 (11th Cir. 2010) (internal quotation marks and citation omitted). As an accomplished epidemiologist and cancer researcher, Dr. Moolgavkar is qualified.
2. Dr. Moolgavkar's Opinion Regarding Mrs. Hanson's Age As Her Primary Risk Factor for Cancer Should Not Be Excluded
Plaintiff argues, "Dr. Moolgavkar has no scientifically reliable evidence with which to support his opinion that Mrs. Hanson's age was the cause of her mesothelioma." (Doc. no. 133, p. 4.) Dr. Moolgavkar opines mesothelioma can occur spontaneously without exposure to asbestos and cites numerous supporting epidemiological studies. (Moolgavkar Expert Rep., pp. 11-14.) Plaintiff does not disagree. Dr. Moolgavkar further explains age is a significant risk factor for cancer and references a large body of epidemiological studies finding age a significant risk factor overall for cancer because the number of cell mutations increase as cell DNA is replicated over a lifespan. (Id. at 7, 14.) Plaintiff does not disagree.
Dr. Moolgavkar also opines age is a significant risk factor for mesothelioma.
*1298 Plaintiff contends this opinion is misleading because the research cited does not show age itself to be a factor, but instead shows mesothelioma typically occurs later in life because of the long latency period between asbestos exposure and onset of mesothelioma. (Doc. no. 133, pp. 4-7.) Dr. Moolgavkar and his colleagues developed the MVK model to study the impact of age and environmental factors on mesothelioma and other types of cancer. (Moolgavkar Expert Rep., pp. 3, 14-15 (listing citations).) In 2009, they published a study analyzing Surveillance, Epidemiology, and End Results ("SEER") data and finding "every doubling of age increases the risk of spontaneous pleural mesothelioma about 30-fold and that of spontaneous peritoneal mesothelioma approximately eight fold." (Id. at 15; Moolgavkar, Pleural and Peritoneal Mesotheliomas in SEER: Age Effects and Temporal Trends, 1973-2005 , 2009, doc. no. 133-5.)
Dr. Moolgavkar's peer-reviewed study applying his MVK model is sufficient by itself to support his opinion regarding age and mesothelioma. However, he also cites other studies demonstrating strong age effects on the incidence of pleural mesothelioma in Canada and Europe. (Moolgavkar Rep., pp. 14-15; see also Cree, Explaining Alberta's Rising Mesothelioma Rates , 2009, doc. no. 133-6; La Vecchia, An Age, Period and Cohort Analysis of Pleural Cancer Mortality in Europe , 2000, doc. no. 133-7; Schonfeld, Regional Variations in German Mesothelioma Mortality Rates: 2000-2010 , 2014, doc. no. 133-8.) While none of these studies specifically disentangle age as an independent factor from asbestos exposure, all show an increase in mesothelioma based on birth cohort years, indicating asbestos exposure and age have independent effects on mesothelioma rates. Plaintiff's criticisms of these studies and Dr. Moolgavkar's opinion are more appropriate for cross examination.
3. The Court Allows Dr. Moolgavkar's Opinions Regarding Mrs. Hanson's Relative Risk from Use of Cosmetic Talc
Plaintiff argues Dr. Moolgavkar's opinion Mrs. Hanson's use of CB talc did not increase her risk of mesothelioma should be excluded because "[t]he only basis he gives for this opinion is his review of, and extrapolations from, epidemiological evidence." (Doc. no. 133, p. 8.) Plaintiff contends Dr. Moolgavkar bases his opinions on SEER data containing no information regarding use of cosmetic talc and studies involving industrial hygiene techniques for air sampling talc for asbestos, an area outside of his expertise. (Id. at 8-9.)
Dr. Moolgavkar bases his opinion primarily on multiple epidemiological studies of talc miners and millers finding no association between extensive occupational exposure to talc, including talc contaminated with anthophyllite, and mesothelioma. (Moolgavkar Expert Rep., pp. 9-10, 30-31.) Dr. Moolgavkar cites epidemiological studies conducted in Italy, France, Austria, and Norway that failed to report a single case of mesothelioma among talc miners and millers. (Id. at 9-10.) In addition, Dr. Moolgavkar cites epidemiological studies of Vermont and New York talc workers where talc was possibly contaminated with small quantities of chrysotile, anthophyllite, and tremolite. (Id. at 10.) These studies also showed no evidence of an increase in risk of mesothelioma. (Id. ) Epidemiological studies are "the best evidence of causation in toxic tort actions." Kilpatrick, 613 F.3d at 1337 n.8 (quotation omitted). Thus, Dr. Moolgavkar's opinion is reliable and should not be excluded.
Notably, Plaintiff claims Dr. Moolgavkar intends to testify he has never seen asbestos in CB talc. (Doc. no. 133, p. 9.) Defendant has no intention of offering this testimony.
*1299 V. CONCLUSION
Accordingly, for the reasons stated above, the Court
(1) GRANTS Defendant's motion to exclude Dr. Webber's testimony, (doc. no. 51);
(2) GRANTS Defendant's motion to exclude testimony of alleged exposure to asbestos, as to Drs. Kradin, Moline, and Webber, and DENIES AS MOOT Defendant's motion as to Dr. Gordon, (doc. no. 52);
(3) GRANTS Defendant's motion to preclude Dr. Gordon's product contamination opinions, (doc. no. 56);
(4) DENIES Plaintiff's motion to exclude Dr. Sanchez's testimony, (doc. no. 60);
(5) GRANTS Defendant's motion to preclude Dr. Gordon's specific causation opinions, (doc. no. 67);
(6) GRANTS Defendant's motion to preclude Drs. Kradin and Moline's causation opinions, (doc. no. 118);
(7) DENIES Defendant's motion to preclude admission into evidence of vintage CB talc containers, (doc. no. 120);
(8) GRANTS IN PART and DENIES IN PART Plaintiff's motion to limit the testimony of Dr. Mossman, subject to the option to conduct a follow-up deposition, as described above, (doc. no. 132);
(9) DENIES Plaintiff's motion to exclude Dr. Moolgavkar's risk factor opinions, (doc. no. 133); and
(10) DENIES AS MOOT Plaintiff's motion to exclude evidence of Dr. Gordon's felonious past, (doc. no. 172).
SO ORDERED this 24th day of September, 2018, at Augusta, Georgia.